T.C. Memo. 1996-455


UNITED STATES TAX COURT



MEDIEVAL ATTRACTIONS N.V.,[1] Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20532-91, 20533-91,   Filed October 9, 1996.
            20534-91, 20535-91,
            20537-91, 20538-91,
            15975-92, 16122-92,
             8587-93,  8923-93.



<u>Lawrence L. Hoenig</u>, <u>Stephen J. Martin</u>, <u>Lisa F. Cetlin</u>,

<u>A. Keller Young</u>, and <u>David I. Bass</u>, for petitioners.

------------------------------------

[1]Cases of the following petitioners are consolidated
herewith:  Medieval Attractions B.V., Successor in Interest to
Medieval Attractions N.V., docket No. 20533-91; Medieval Dinner &
Tournaments, Inc., Successor in Interest to Medieval Attractions
N.V., docket No. 20534-91; Medieval Attractions N.V., docket No.
20535-91; Medieval Attractions B.V., Successor in Interest to
Medieval Attractions N.V., docket No. 20537-91; Medieval Dinner &
Tournament, Inc., Successor in Interest to Medieval Attractions
N.V., docket No. 20538-91; Medieval Show, Inc., docket No.
15975-92; Medieval Show, Inc., docket No. 16122-92; Medieval
Dinner & Tournament, Inc., docket No. 8587-93; and Medieval
Dinner & Tournament, Inc., docket No. 8923-93.

Howard P. Levine, Benjamin A. deLuna, Kim A. Palmerino, and Robert F. Conte, for respondent.

Table of Contents

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . .   8

   I.  Background . . . . . . . . . . . . . . . . . . . . . . .   9

  II.  Expansion to the United States . . . . . . . . . . . . .  11
      A.  Florida--Personnel and Pre-1986
          Corporate Structure . . . . . . . . . . . . . . .  11
      B.  California--Personnel and Pre-1986
          Corporate Structure . . . . . . . . . . . . . . .  20

 III.  Continued Development . . . . . . . . . . . . . . . . .  25

  IV.  Contracts . . . . . . . . . . . . . . . . . . . . . . .  28

   V.  Coopers & Lybrand Planning and
      Petitioners' Documentation . . . . . . . . . . . . . .  29

  VI.  Trademarks and Copyrights . . . . . . . . . . . . . . .  52

 VII.  Section 351 Transfers . . . . . . . . . . . . . . . . .  54

VIII.  California and New Jersey Expansion . . . . . . . . . .  59
      A.  California . . . . . . . . . . . . . . . . . . . .  59
      B.  New Jersey . . . . . . . . . . . . . . . . . . . .  60
      C.  C&L Advice . . . . . . . . . . . . . . . . . . . .  61

  IX.  Dividends . . . . . . . . . . . . . . . . . . . . . . .  64

   X.  Marketing Agreement . . . . . . . . . . . . . . . . . .  66

  XI.  Commercial Paper . . . . . . . . . . . . . . . . . . .  67

 XII.  Royalty Transactions Relied Upon in
      Federal Tax Returns . . . . . . . . . . . . . . . . .  74

XIII.  Federal Tax Returns . . . . . . . . . . . . . . . . . .  75
      A.  MTNV/MSI . . . . . . . . . . . . . . . . . . . . .  75
      B.  MANV/MDT . . . . . . . . . . . . . . . . . . . . .  78
      C.  Eurotor . . . . . . . . . . . . . . . . . . . . .  80

 XIV.  Certified Audit . . . . . . . . . . . . . . . . . . . .  80

  XV.  IRS Audit . . . . . . . . . . . . . . . . . . . . . . .  81

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

   I.   Management and Consulting Fees . . . . . . . . . . . . . 83
      A.  Eurotor . . . . . . . . . . . . . . . . . . . . . . 86
         1.  Services . . . . . . . . . . . . . . . . . . . 86
         2.  Compensation in Proportion to Stockholdings  . 87
      B.  Royal Catering . . . . . . . . . . . . . . . . . . 92
      C.  A. Gelabert, Santandreu, and Segui . . . . . . . . 93

  II.   Franchise Transactions and Royalty Fees  . . . . . . . 95

 III.   Interest Expense and Guarantee Fees Resulting
      From Lump-Sum Franchise Payments . . . . . . . . . . 111

  IV.   Interest Deductions on the
      Section 351 Transactions . . . . . . . . . . . . . . 121

   V.   The $236,313 That MDT Paid to
      MSI as a Marketing Fee . . . . . . . . . . . . . . . 128

  VI.   New Jersey and California Expansion Expenses . . . . . 129

 VII.   Additions to Tax and Penalties for
      Fraud and Negligence . . . . . . . . . . . . . . . . 131
      A.  Fraud  . . . . . . . . . . . . . . . . . . . . . 131
      B.  Negligence . . . . . . . . . . . . . . . . . . . . 137

VIII.   Substantial Understatement and Increased Interest  . . 142
      A.  Substantial Understatement . . . . . . . . . . . . 142
      B.  Increased Interest . . . . . . . . . . . . . . . . 143

  IX.   Withholding of Tax at the Source . . . . . . . . . . . 144
      A.   Interest That MDT and MSI
          Paid to MABV and MTBV, Respectively  . . . . . 146
      B.   Franchise Fees That Were Paid by MANV to Manver in
          Fiscal Year Ended November 30, 1987  . . . . . 147
      C.   MDT and MSI Payments to Manver in March 1988 . . . 148
      D.   Amounts That MANV, MSI, and MDT Paid to Eurotor as
          Management and Consulting Fees . . . . . . . . 149
      E.   Guarantee Fees Paid to Dapy and
          Roundabout in Connection With the
          Commercial Paper Transactions  . . . . . . . . 150

   X.   Failure To Deposit Withholding Tax . . . . . . . . . . 151

Table of Entity Abbreviations

```
ANZ  . . . . . . . . . . . . . . Australia and New Zealand Bank
Amsrott  . . . . . . . . . . . . Amsrott, N.V.
Attractours  . . . . . . . . . . Attractours, N.V.
C&L  . . . . . . . . . . . . . . Coopers & Lybrand
CANV . . . . . . . . . . . . . . Corporate Agents, N.V.
Calinvest  . . . . . . . . . . . Calinvest, N.V.
Celin  . . . . . . . . . . . . . Celin, N.V.
Dapy . . . . . . . . . . . . . . Dapy, N.V.
Edemle . . . . . . . . . . . . . Edemle, N.V.
Estaspan . . . . . . . . . . . . Estaspan, Ltd.
Etano  . . . . . . . . . . . . . Etano, N.V.
Eurotor  . . . . . . . . . . . . Europea de Espectaculos,
                                   Cenas y Torneo Medievales, S.A.
Futureprom . . . . . . . . . . . Futureprom, N.V.
GCI  . . . . . . . . . . . . . . Glendale Castle, Inc.
Gatetown . . . . . . . . . . . . Gatetown Limited
Harris . . . . . . . . . . . . . Harris, Lippman & Co.
Holiday  . . . . . . . . . . . . Holiday Tours, N.V.
Inverspan  . . . . . . . . . . . Inverspan, N.V.
KDS  . . . . . . . . . . . . . . Kingdom of Dancing Stallions
LL . . . . . . . . . . . . . . . Lyon & Lyon
Lebasi . . . . . . . . . . . . . Lebasi, N.V.
Lince  . . . . . . . . . . . . . Lince, N.V.
MABV . . . . . . . . . . . . . . Medieval Attractions, B.V.
MANV . . . . . . . . . . . . . . Medieval Attractions, N.V.
MCI  . . . . . . . . . . . . . . Meadowland Castle Inc.
MDT  . . . . . . . . . . . . . . Medieval Dinner & Tournament, Inc.
MICV . . . . . . . . . . . . . . Manver International, C.V.
MSI  . . . . . . . . . . . . . . Medieval Show, Inc.
MTBV . . . . . . . . . . . . . . Medieval Times, B.V.
MTNV . . . . . . . . . . . . . . Medieval Times, N.V.
Manver . . . . . . . . . . . . . Manver, N.V.
NCB  . . . . . . . . . . . . . . National Community Bank
Primavert  . . . . . . . . . . . Primavert, N.V.
Promidux . . . . . . . . . . . . Promidux, N.V.
Protravol  . . . . . . . . . . . Protravol Limited
RC . . . . . . . . . . . . . . . Royal Catering, Inc.
Roundabout . . . . . . . . . . . Roundabout Tours, N.V.
SDCI . . . . . . . . . . . . . . San Diego Castle, Inc.
Slider . . . . . . . . . . . . . Slider, N.V.
Spectrust  . . . . . . . . . . . Spectrust, N.V.
TM . . . . . . . . . . . . . . . Torneo Medieval, S.A.
Wayout . . . . . . . . . . . . . Wayout Tours, N.V.
```

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined deficiencies and additions to tax and penalties in petitioners' Federal income taxes as follows:

<u>Docket No. 20532-91</u>

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| 11/30/87 | $929,752 | $46,488 | 50% of interest due on $929,752 | $185,950 |

<u>Docket No. 20533-91</u>

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| 11/30/87 | $929,752 | $46,488 | 50% of interest due on $929,752 | $185,950 |

<u>Docket No. 20534-91</u>

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| 11/30/87 | $929,752 | $46,488 | 50% of interest due on $929,752 | $185,950 |

<u>Docket No. 20535-91</u>

| Year | Deficiency |
|---|---|
| 1987 | $21,600 |

<u>Docket No. 20537-91</u>

| Year | Deficiency |
|---|---|
| 1987 | $21,600 |

Docket No. 20538-91

| Year | Deficiency |
|------|-----------|
| 1987 | $21,600 |

Docket No. 15975-92

| Tax Year Ended | Deficiency | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6653(b)(1) | Sec. 6661 |
| 7/31/88 | $808,755 | $606,566 | 50% of interest due on $808,755 | -- | $202,189 |
| 7/31/89 | 869,682 | -- | -- | $652,261 | 217,420 |

Docket No. 16122-92

| Year | Deficiency | Addition to Tax Sec. 6653(b)(1) |
|------|-----------|--------------------------------|
| 1988 | $1,378,634 | $1,078,379 |

Docket No. 8587-93

| Year | Deficiency | Addition to Tax and Penalties | | |
|---|---|---|---|---|
| | | Sec. 6653(a) | Sec. 6656(a) | Sec. 6662(a) |
| 1988 | $2,742,859 | $137,143 | $284,657 | -- |
| 1989 | 428,739 | -- | 52,009 | $85,747 |

Docket No. 8923-93

| Tax Year Ended | Deficiency | Additions to Tax and Penalty | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662(a) |
| 11/30/88 | $2,526,905 | $126,345 | $631,726 | -- |
| 11/30/89 | 2,929,741 | -- | -- | $585,948 |

After concessions, the issues remaining for decision are: (1) Whether amounts deducted as management and consulting fees are reasonable payments for services rendered; (2) whether the

franchise transactions petitioners entered into were bona fide so that petitioners are entitled to deduct royalty payments, or whether an adjustment under section 162 or 482 is warranted; (3) whether amounts petitioners deducted as interest and guarantee fees were associated with bona fide debt; (4) whether amounts petitioners deducted as interest in section 351 transactions were associated with debt; (5) whether Medieval Dinner & Tournament, Inc., is entitled to deduct $236,313 that it paid Medieval Show, Inc., as a marketing fee; (6) whether petitioners may claim as current deductions the costs associated with New Jersey and California expansions; (7) whether some of petitioners are liable for the additions to tax and penalties for fraud, or in the alternative, negligence; (8) whether some of petitioners are liable for the additions to tax for substantial understatement of income tax liability and increased interest; (9) whether some of petitioners are liable for withholding of tax at the source for interest, debt guarantee, consulting and management fees, royalty payments, and franchise fees; and (10) whether Medieval Dinner & Tournament, Inc., is liable for the section 6656 addition to tax for failure to deposit withholding of tax.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The evidence from 30 days of trial included 6,368 pages of transcript and thousands of exhibits, many of which contained multiple parts and/or were duplicates of other exhibits. The failure of the parties to engage in timely, good faith, voluntary and orderly exchange of documents resulted in the necessity of 39 separately filed stipulations through the course of the trial, without logical or consistent sequence or organization. It is not reasonable to reproduce here all of the findings requested by the parties. Many of them are exaggerated extrapolations or unrealistic interpretations of the evidence. We have set forth only those findings that are necessary to explain and dispose of the issues for decision in these cases. Detailed findings concerning certain documents are necessary because of disputes as to the sham or fraudulent nature of petitioners' transactions. Documents and facts at times subsequent to the years in issue are set forth because they are relevant in determining when or whether other documents were prepared or events occurred. The other agreed facts are incorporated in our findings by this reference.

## FINDINGS OF FACT

Petitioner Medieval Show, Inc. (MSI), is a corporation organized under the laws of Florida with its principal place of business in Kissimmee, Florida. Petitioner Medieval Dinner &

Tournament, Inc. (MDT), is a corporation organized under the laws of California with its principal place of business in Buena Park, California.  MDT is a successor in interest to Medieval Attractions, B.V. (MABV), a corporation organized under the laws of The Netherlands, and MABV is a successor in interest to Medieval Attraction, N.V. (MANV), a corporation organized under the laws of the Netherlands Antilles.

I.  Background

The concept for entertainment facilities that came to be known as Medieval Times originated in Spain.  During the late 1960's and into the 1970's, Jose Montaner (J. Montaner) and his sisters owned a successful barbeque in Son Termens, Spain. J. Montaner's family had lived for centuries on the island of Mallorca off the coast of Spain.  J. Montaner's mother was the Countess of Peralada, and his family held the rights to use the title of the Viscount of Rocaberti.

J. Montaner had an interest in medieval history and incorporated that interest into a dinner theater and medieval show located in L'Alqueria in Spain.  After the L'Alqueria show became successful, J. Montaner moved the show to Son Termens. In July 1973, J. Montaner, his sisters, Francisco Bosch Oliver (Bosch), and Jose Planas Llabres de Jornets incorporated Son Termens, S.A., to operate a dinner theater in Son Termens. The show at Son Termens featured a meal and medieval entertainment that included period costumes, knights on

horseback, and jousting.  The show resembled scenes from the movie "El Cid", which J. Montaner had seen prior to creating the show.  The show was run by the corporation, and J. Montaner was a minority shareholder.

Jaime Climent (Climent) had several businesses in Benidorm, Spain, including a barbeque restaurant with seating for 2,000 people, called Rancho Grande.  Climent was familiar with J. Montaner's show and wanted to bring it to Benidorm.  Climent contacted J. Montaner, and they agreed to open a show in Benidorm.  On January 25, 1977, Torneo Medieval, S.A. (TM), was incorporated in Spain.  The initial shareholders of TM were Climent, 45 percent; J. Montaner, 13 percent; Juan Colom Valcaneras, 15 percent; Juan-Pedro Rousselet Barbaud (Rousselet), 15 percent; and Bosch, 12 percent.  TM operated a medieval theme dinner theater in Benidorm in a castle known as Castell Comte D'Alfaz.

Some of the Son Termens employees were transferred to Benidorm to assist with opening the show.  The Benidorm show was similar to the Son Termens show, and, over time, innovations were incorporated into the Benidorm show.  The show in Benidorm became profitable 2 to 3 years after it began operating.  Neither J. Montaner, his sisters, nor the other shareholders of Son Termens, S.A., were compensated by TM for the use of the medieval dinner show concept.

II.  Expansion to the United States

A.  Florida--Personnel and Pre-1986 Corporate Structure

Cristobal Segui (Segui) was a successful Spanish businessman.  He owned an interest in Son Amar, a large nightclub operated on Mallorca that catered to tourists.  He also owned an interest in La Granja, a medieval village on Mallorca.  Alfonso Chavez (Chavez) was a U.S. citizen who lived in the same building as Segui.  Chavez was interested in finding an attraction to take to the United States and spoke to Segui about the show in Benidorm.  J. Montaner also had been interested in opening a show in the United States.  Segui discussed Chavez's proposal with J. Montaner, and they decided to put together a group of investors interested in opening a medieval show in the United States.  The original group consisted of J. Montaner; Segui; Climent; Pedro Montaner (P. Montaner), J. Montaner's nephew; Johan Kahne (Kahne), a business associate of P. Montaner; and Vincente Valiente (Valiente).  This group of investors and Martin Santandreu (Santandreu), who joined the group later, comprised the Spanish investors.

The Spanish investors were successful businessmen, each with a net worth exceeding $1 million.  Resumes provided to a bank in a loan application filed by Inverspan, N.V. (Inverspan), during 1982 or 1983 contained personal information on the Spanish investors and included the following:

P. Montaner:  39 years old; lawyer; president of 12 companies; owns various parcels of land in Spain; personal estate value of $6 million.

J. Montaner:  61 years old; diploma in tourism; part owner of a tourist complex that holds 3,000 people; owns flats and plots of land; personal estate value of $3.5 million.

Santandreu:  48 years old; bachelor's degree; 100-percent owner of three perfume stores; 25-percent owner of a financing company; 20- to 50-percent owner in several other businesses, including nudist camps and nightclubs; owner of land and property; personal estate value of $4.1 million.

Sequi:  41 years old; bachelor's degree; 100-percent owner in two real estate companies; 25- to 50-percent owner in other companies, including a museum, restaurant, and tourist attractions; owner of land in Spain; personal estate value of $2.75 million.

Climent:  45 years old; business administration; part owner of dinner show, hotel, jousting show; personal estate value of $1 million.

In 1980, Segui and J. Montaner traveled to the United States to study the tourism market.  They visited Orlando, Florida, in June 1980.  In October 1981, a group of the Spanish investors came to the United States to find a location for the dinner show. Climent noticed a suitable parcel of land on Highway 192 in

Kissimmee, Florida.  A sales contract was signed to purchase the Highway 192 parcel in October 1981.

The Spanish investors hired Chavez to assist with the Florida plans.  Chavez and his wife were heavily involved in the preliminary development and organization of the Florida operation and frequently represented the Spanish investors.  Chavez's activities included buying land and looking for estimates, contractors, engineers, architects, attorneys, accountants, and banks.  Chavez signed the contract to purchase the Florida land for the castle and located Charles H. Parsons (Parsons), a Florida architect.  The land contract named the buyer as "an Offshore Corporation to be formed".

In 1982, Parsons traveled to the Don Pancho Hotel in Spain to meet with several of the Spanish investors regarding the construction of the castle in Kissimmee.  Parsons viewed the castle at Benidorm and was given preliminary drawings that a Spanish architect had made of the Benidorm castle.  Chavez eventually signed the contract hiring Parsons.  The Spanish investors had several other meetings at the Don Pancho Hotel to discuss the U.S. venture.  During one of these meetings, Santandreu promised the Spanish investors that the American company would compensate them for their work.

The Spanish investors began to form several corporations to develop the Florida project.  The first corporation, Inverspan, was incorporated on November 19, 1981, in the Netherlands

Antilles with the assistance of Florida counsel, Thomas Allen (Allen) of Maguire, Voorhis & Wells, and Netherlands Antilles attorneys, L.A. Haley and Y.L. Cuales of Corporate Agents, N.V. (CANV). Inverspan was created to own the land and building used for the Florida castle. The shareholders of Inverspan were: Chavez and Climent, 11.1 percent each; Kahne, J. Montaner, and P. Montaner, 13.08 percent each; Santandreu and Segui, 12.62 percent each; and Valiente, 13.32 percent. (Family members such as husbands and wives who both held shares are included under the family name.)

Medieval Times, N.V. (MTNV), was incorporated in the Netherlands Antilles on December 21, 1982, with the assistance of Allen and CANV. MTNV was formed to operate the Florida castle. The MTNV shares were held by the same individuals and in the same proportions as the Inverspan stock. Inverspan paid the costs of constructing the Florida castle with a $2.65 million loan from a bank. The MTNV-Inverspan shareholders pledged $1.4 million collateral for the loan.

Before the name "Medieval Times" was selected, the name "El Cid" and "A Dinner Theater in a Castle" were considered. The movie "El Cid" had been released in 1961 and contained scenes that depicted a medieval castle with towers, period costumes, jousting, sword fighting, and knights, all of which became elements of the Medieval Times show. The Spanish investors considered hiring Charlton Heston, the star of "El Cid", to open

the MTNV castle in Florida, but they rejected the idea because of the expense.

The Spanish investors needed a vehicle in which to invest and travel to the United States because it was illegal under Spanish law for Spanish citizens to invest in the United States without permission from the Spanish Government. The Spanish investors formed Europea de Espectaculos, Cenas y Torneo Medievales, S.A. (Eurotor), in Spain on September 1, 1982, for the purpose of carrying out, among other objectives, the promotion and development of public entertainment either in Spain or abroad. Eurotor's original shareholders were the Spanish investors: Climent, 25 percent; Valiente, 12.5 percent; Santandreu, 12.5 percent; Segui, 12.5 percent; J. Montaner, 12.5 percent; P. Montaner, 12.5 percent; and Kahne, 12.5 percent. Of this group, only J. Montaner and Climent were shareholders of TM, which operated the show in Benidorm.

In approximately November or December 1982, Eurotor requested permission from the Spanish Government to invest in the United States. Permission was granted in March 1983. The Spanish investors had earlier chosen to invest in Inverspan and MTNV without reporting their investments to the Spanish Government. They chose not to report because they believed the process was complicated and difficult and because they thought the response from the Spanish Government would be negative.

Subsequent to the formation of MTNV, several more Netherlands Antilles companies were formed from 1983 through 1986 for use by the Spanish investors. The Spanish investors were concerned about confidentiality and had the stock of all of the corporations, including Inverspan and MTNV, issued in bearer form to protect the identity of the shareholders. The Spanish investors decided to protect their identities further by using corporations to represent their interests. The corporations that were created to represent the Spanish investors with their owners were: Spectrust, N.V. (Spectrust)--Valiente (Valiente died in 1988, and Climent married Valiente's widow and took control of Spectrust); Promidux, N.V. (Promidux)--P. Montaner; Dapy, N.V. (Dapy)--Kahne; Attractours, N.V. (Attractours)--J. Montaner (P. Montaner, J. Montaner, and Kahne acted as a group in representing and voting the shares of Promidux, Dapy, and Attractours); Roundabout Tours, N.V. (Roundabout) (and later Primavert, N.V. (Primavert))--Santandreu; Holiday Tours, N.V. (Holiday)--Segui; and Wayout Tours, N.V. (Wayout)--Climent.

These corporations, each owned by a Eurotor shareholder, were known as the Eurotor group of companies. After the corporations were formed, the bearer shares of MTNV stock that were owned by each of the Eurotor shareholders were transferred to each shareholder's respective Netherlands Antilles corporation. After the stock transfers, the MTNV shareholders consisted of the Netherlands Antilles corporations: Spectrust;

Promidux; Dapy; Roundabout; Attractours; Wayout; Holiday; and, in his individual capacity, Chavez. Chavez, a U.S. citizen, was not a Eurotor shareholder and did not have a Netherlands Antilles corporation representing his interest in MTNV.

Andres Gelabert (A. Gelabert) worked for Segui at Segui's nightclub in Spain. He was sent to Florida to supervise construction and to set up the operations of the Florida castle. On May 16, 1983, Allen, on behalf of MTNV, offered to A. Gelabert, in writing, the position of managing director of MTNV. The offer provided for a salary of $24,000 per year and 3 percent of gross revenues. A. Gelabert's duties included supervising the construction of the castle in Florida; recruiting and training 70 to 100 persons to be employed by MTNV, particularly kitchen staff; ensuring all aspects of the production, including verifying that the costumes and props were historically accurate; and developing marketing and public relations strategies. The offer was contingent on A. Gelabert's getting approval from the U.S. Immigration and Naturalization Service to work in the United States.

Royal Catering, Inc. (RC), was incorporated in Florida by Allen on June 30, 1983. A. Gelabert was listed as the sole corporate director. A. Gelabert was the sole shareholder of RC during the years in issue. RC was purportedly established to provide catering services to the castle. Initially, RC was actually used only as a vehicle to obtain U.S. visas for

A. Gelabert and Jose "Pepe" Sans (Sans). The MTNV shareholders loaned $100,000 to RC. The loan was repaid between March and June 1985. The interest on the loans was paid from an MTNV account. During the years in issue, RC's "books and records" were petitioners' books and records.

In addition to A. Gelabert, Climent assembled other personnel in Spain to bring to the United States to assist with the Florida operation. These individuals included George Stonecrow (Stonecrow); Vicente Valiente, Jr. (Valiente, Jr.); Jose "Pepe" Castro (Castro); and several knights (Tino Brana, Victor Lara, Robin Brevik, and Javier Elvira). Climent also had 140 crates of materials sent to Florida from Spain. The materials included costumes, weapons, objects for the horses, and decorations.

By the end of 1982, Chavez was no longer involved in the daily Florida operation that was run primarily by A. Gelabert and Castro. A. Gelabert was in charge of the castle construction, aspects of the show, and the food and beverages. A. Gelabert and Castro also secured construction bids, worked with the banks on loans, worked with the engineers and contractors, applied for licenses and certificates such as employer identification numbers and liquor licenses, procured services, paid bills, purchased restaurant equipment, provided for the care of the horses, and coordinated the kitchen design and construction.

Stonecrow was knowledgeable about the medieval era and maintained the historical authenticity of the show. Stonecrow designed and sewed costumes and painted murals. Stonecrow was the producer of the MTNV show in Florida and was the master of ceremonies when the Florida castle opened in December 1983.

Charles C. Bellows (Bellows) was hired by MTNV as the marketing manager in 1983. Bellows heard about the castle's opening in Florida and contacted MTNV. He met with Segui and Santandreu, who offered him the position. Bellows was experienced in the entertainment market, having previously worked for Holiday Inn Worldwide Sales and then for Ringling Brothers Barnum & Bailey Circus World in Florida. Bellows hired an assistant, Andrea Kudlacz (Kudlacz), who had previously worked for Disney World in Florida. Bellows created a marketing plan and budget, hired staff and marketing consultants, and made contacts with the Florida tour industry. He established procedures for the marketing department. He and his staff developed brochures and other printed marketing materials. Bellows and Kudlacz oversaw the production and purchase of print, radio, and television advertising for MTNV. Bellows' wife designed the letter style used to write the words "Medieval Times". Bellows originally reported to Segui but began reporting to A. Gelabert when A. Gelabert was appointed general manager of the Florida operation. In some instances, the Spanish investors would review Bellows' plans, give directions, and make

suggestions regarding marketing actions that they wanted Bellows to take.  In 1985, Bellows set up an in-house advertising agency at MTNV.

Bellows monitored MTNV's competition in the central Florida area.  The companies that MTNV considered as competition included "King Henry's Feast", which was operating during the mid-1980's.  King Henry's Feast was a medieval dinner show that seated 600 to 700 customers.  The customers were served a meal and watched a show that included sword fights with armor and acrobats.  For a period of time, King Henry's Feast featured jousting, although it was not part of the dinner show.

Leandro Galindo (Galindo) met A. Gelabert while A. Gelabert was working on the Florida castle.  A. Gelabert sent Galindo to a horse training school in Florida for about 6 months so that Galindo could become a knight.  A. Gelabert also asked Galindo to set up a photography department.  Galindo researched equipment and presented the information to A. Gelabert.  A. Gelabert chose a photography equipment company that provided a 2-week training session with the purchase of equipment.  To the best of Galindo's knowledge, no one at MTNV knew anything about photography equipment.  Galindo set up the lab and hired and managed the six employees who worked in the photography department.

The general concept of taking pictures at the castle was not new.  Photographs were taken and distributed to customers at Son Termens in Spain.  The methods used to take the pictures and

the type of shots available to the customers, however, were new. Galindo and his staff experimented with their own methods of making photography sales profitable. Some ideas were not successful and some ideas, such as group shots, were successful and became part of MTNV's operation.

Climent moved to Florida in the fall of 1983 and stayed until the end of January 1984. Segui, Santandreu, and P. Montaner also came to the United States to assist with the opening of the Florida castle. After the Florida opening, the Spanish investors returned to Spain. Some of the investors visited the United States occasionally after their return to Spain.

B. California--Personnel and Pre-1986 Corporate Structure

In the spring of 1985, the Spanish investors discussed the possibility of expanding to California. In June 1985, Bellows and Kudlacz went to Southern California and met with Wesley Taylor (Taylor), a commercial real estate broker. Taylor had a listing on property that had formerly belonged to a company called the Kingdom of the Dancing Stallions (KDS) in Buena Park, California. In the fall of 1985, A. Gelabert met with Taylor to discuss the KDS property.

Initially, Kahne and J. Montaner advised against expanding to California due to several factors, including the cost of a new castle. Santandreu and Segui, however, concluded that the cost would be reduced by altering the existing building on the KDS

property to fit a medieval theme even though it would be dissimilar to the Florida castle.  The reassessment of expenses helped persuade the Spanish investors to proceed in California.

A. Gelabert signed the contract to purchase the KDS property on December 4, 1985.  Taylor did not meet with any of the Spanish investors until January 1986.  Expenses incurred by Santandreu, Segui, J. Montaner, and Kahne in connection with investigating the California castle were paid by MTNV.

The same type of corporate organization was used to operate the California castle as the Florida castle.  On December 30, 1985, Calinvest, N.V. (Calinvest), was incorporated in the Netherlands Antilles.  The purpose of Calinvest was to own the land and building used for the California castle.  On December 31, 1985, MANV was incorporated for the purpose of operating the Buena Park castle.  The shareholders of Calinvest and MANV were as follows:

| Name | Interest in MANV | Interest in Calinvest |
| --- | --- | --- |
| Dapy (Kahne[1]) | 12% | 17% |
| Holiday (Segui[1]) | 12% | 17% |
| Primavert (Santandreu[1]) | 12% | 20% |
| Promidux (P. Montaner[1]) | 12% | 17% |
| Roundabout (Santandreu[1]) | 12% | 17% |
| Spectrust (Valiente[1]) | 5% | 5% |
| Wayout (Climent[1]) | 5% | 5% |
| Royal Catering (A. Gelabert[1]) | 5% | 2% |
| Estaspan, Ltd. | 5% | - |
| Santandreu | 5% | - |
| J. Montaner | 5% | - |
| Segui | 5% | - |
| Kahne | 5% | - |

[1]Denotes the owners of the corporations who held the interests in MANV and Calinvest.

Estaspan, Ltd. (Estaspan), was a Bermuda corporation controlled by Gavin H. Watson, Jr. (Watson). Watson was MTNV's banker in Florida. Chavez did not participate in the California operation. Chavez wanted to participate in California, but the Spanish investors specifically excluded him.

Sans, who had known Segui since childhood, came over from Spain in late 1985 to run the Florida castle so that A. Gelabert could go to California. Sans took over as general manager of the Florida operation. He had no experience running a dinner show. His experience was limited to operating a restaurant and tour agency in Spain.

A. Gelabert went to California in early 1986 to renovate the existing KDS building and to set up the California operation. He hired a general contractor and a kitchen contractor and brought Florida MTNV employees to work on the California castle. A. Gelabert also brought several artists from Florida and hired local artists to paint murals and crests at the California castle.

Bellows developed a marketing program for the California castle prior to its opening in 1986. He used the expertise he had acquired in Florida and interviewed and hired new personnel. The California market differed from the Florida market because

the California clients were primarily local residents and not out-of-town tourists.

TM did not send property or supplies to California. The Florida castle transferred horses and knights and other equipment and employees to California. Peter Woefel (Woefel), the food and beverage manager of the Florida castle, moved to California to become the food and beverage manager of the California castle. Woefel oversaw the food preparation and kitchen operation and, in May 1987, prepared a procedure review memorandum concerning alcoholic beverage procedures for the California castle. Stonecrow provided extensive services to the California castle from 1986 to 1989. Galindo sent one of his staff to California to establish the California photography lab. The California lab was modeled after the Florida lab. Galindo created an operations manual for the California lab based on his experience in Florida. When the California castle opened, the best knights from the Florida castle were sent to California to work as knights and to train other knights.

III.  Continued Development

The Florida castle opened in December 1983.  Several improvements and changes were made from 1985 to 1989, including demolition of a ramp and a new entry to the existing building; a new lounge; new heating and air conditioning; a new ticket office; new offices; a new kitchen, including marinating tubes; replacing electric stoves with gas stoves; new stables; and a medieval village.

The annual Florida attendance figures were as follows:

| Year | Attendance | Year | Attendance |
|------|------------|------|------------|
| 1984 | 183,272 | 1989 | 470,000 |
| 1985 | 257,350 | 1990 | 525,200 |
| 1986 | 308,391 | 1991 | 550,000 |
| 1987 | 388,071 | 1992 | 575,000 |
| 1988 | 399,776 | 1993 | 600,000 |

The California castle opened in June 1986.  From 1986 to 1989, many renovations and additions were made to the California castle.  A formal gift shop, Hall of Flags/Arms, and a torture museum were added.  Renovations included a redesign of the existing facility, remodeling the banquet facility with a dance floor, and remodeling the kitchen, museum, and bathroom.

RC and MDT entered into a Management Agreement that was dated December 1, 1987.  A. Gelabert was the owner and president of RC.  The agreement called for RC to manage its food and beverage operation.  MDT was to provide all of the kitchen facilities and to employ all of the wait staff.  RC was to receive 5 percent of gross profits, and MDT was to reimburse RC

for "salary, payroll taxes, insurance and other related expenses for president of Manager, food and beverage manager of Medieval and assistant food and beverage manager of Medieval." The agreement was notarized on March 8, 1988.

Both the Florida and California operations were structured into departments that included marketing, accounting, food and beverage, show, sound and lighting, photography, gift shop, and stables and knights. The department heads reported to the general manager of each castle. The general manager approved changes that were improvements in the operation of the castle and did not substantially change the "theme" of the show. The general managers provided information on the operations to the Spanish investors.

Jack Rein (Rein) was a professionally trained actor and dramatic writer. He was hired by the California castle as the emcee a month after it opened in 1986. When Rein commenced his employment, he was given a 10-page outline of the show. Rein began updating the script during 1987 and 1988, making it more complete by adding dialogue for different characters and for the emcee. Every 6 months or so, the ending of the story was changed, and changes were made to the script to reflect the different endings. Rein continued to update and vary the script to reflect dialogue changes in the show. In 1992, Rein prepared a script that became the standard for all of the castles.

Recorded music was used in the Medieval Times shows between 1983 and 1990, including excerpts from "El Cid" and "Conan the Barbarian". Michael Schwartz (Schwartz) and Dan Friedman (Friedman) composed a soundtrack in 1991 for the Medieval Times shows that was used in all of the castles. Schwartz was an employee of MANV and approached A. Gelabert about the idea of composing an original score. Schwartz and Friedman prepared a demonstration recording for A. Gelabert. A. Gelabert liked the demonstration, so Schwartz and Friedman composed music for the entire show. Schwartz and Friedman produced the music at their own risk and presented it to the Spanish investors. The Spanish investors approved the score and paid Schwartz and Friedman $18,000 for their finished product. The fee was originally paid by MANV through its successor in interest, MDT.

In 1989, A. Gelabert met with Michael Hartzell (Hartzell), who was the Director of Entertainment for the Excalibur Hotel and Casino in Las Vegas, Nevada. Hartzell was interested in locating an independent contractor to produce a Medieval Times-type show at the Excalibur. The Excalibur opened the King Arthur's Tournament Show (King Arthur's) in the hotel on June 15, 1990 without the assistance of A. Gelabert or the Medieval Times companies. King Arthur's seated 900 customers and featured a meal, jousting, and knights. The hotel also had a medieval village with 22 shops and five specialty restaurants. As of

1995, Medieval Times had not initiated any type of legal proceeding against the Excalibur in relation to King Arthur's.

IV. Contracts

Before the Florida castle opened, the Eurotor shareholders wanted assurances that they would be compensated for their assistance in the development of Medieval Times. Allen drafted an agreement, dated January 24, 1983, between MTNV and Eurotor and TM, with Eurotor and TM referred to collectively as Eurotor. The agreement required that Eurotor open an office in Florida and provide management and personnel to assist with the construction and operation of the Florida castle. MTNV agreed to compensate Eurotor with payments of 2 percent of the total estimated cost of the facility (excluding financing costs) during both the creation and development phase of building the castle (for a total of 4 percent) and 50 cents per customer during the operational phase of the castle. The agreement stated that it was to be in effect for a period of 10 years from the date of the agreement. The agreement did not refer to any other fee agreements. The agreement was signed by A. Gelabert for Eurotor, Climent for TM, and Allen for MTNV. The agreement did not mention or refer to a franchise.

Prior to drafting the January 24, 1983, contract, Allen had written a list of items that he needed to include in the document. His notes did not contain a reference to any other

agreements.  A list of the documents that were in existence in Kissimmee during 1983 referred to the January 24, 1983, contract.

V.  Coopers & Lybrand Planning and Petitioners' Documentation

Coopers & Lybrand (C&L) is a "big six" accounting firm known for its worldwide market.  C&L prepared all of the tax returns for the Medieval Times companies beginning with the MTNV return in 1982.

In 1985, Santandreu sought the assistance of C&L in Brussels, Belgium, to find a structure that could be used for the nontaxable receipt of payments made to the Spanish investors by MTNV.  C&L suggested the use of a nonresident United Kingdom company to Santandreu in a letter dated August 6, 1985.

Gatetown Limited (Gatetown) was a United Kingdom corporation registered on or about May 1, 1985, by Nigel Leonard Blood.  In March 1986, Segui's father-in-law, Jose Garcia de Oteyza Romero (de Oteyza), was in contact with Harris, Lippman & Co. (Harris), an accounting firm in the United Kingdom.  In an April 1986 letter, de Oteyza sent funds to Harris to acquire Gatetown.  The letter stated that "Gatetown Limited will take care of getting paid Royalties and copyrights of a Dinner-Show situated in the U.S.A."  The correspondence also referred to a company called Protravol Limited (Protravol) that would be used for the "buying and selling from Spain to U.S.A. of souvenirs".  The letter informed Harris that the directors of both companies should be de

Oteyza and Jaime Antonio Mayol Castaner (Mayol), Segui's brother-in-law.

In a letter to the United Kingdom taxing authority in 1987, Harris represented that Gatetown commenced business March 1, 1986; that Gatetown's registered office was in Palma de Mallorca, Spain; and that the nature of the company's activities was as owner of royalty and copyright agreements. Gatetown's original incorporators resigned on June 12, 1986, and Mayol and de Oteyza were named as the officers. The Gatetown stock, which consisted of two shares, was held equally by Mayol and de Oteyza as nominees.

On May 1, 1986, A. Gelabert sent to Francois A. Nouel (Nouel) of CANV a letter requesting that, among other things, Nouel submit the names of Manver, Lince, and Attractours for approval by the Chamber of Commerce of the Netherlands Antilles. Attractours, Lince, N.V. (Lince), and Manver, N.V. (Manver), were incorporated in the Netherlands Antilles on or about May 16, 1986. Lince was owned by Holiday, Roundabout, Dapy, and Promidux. Manver was owned by Spectrust and Wayout. Attractours was owned by Promidux and Dapy. The Manver incorporation fees were paid by Wayout. Lince was capitalized with $6,000 on May 19, 1986, from an account maintained in the name of Holiday.

Ian Forsyth (Forsyth) was the international tax partner at the C&L Los Angeles, California, office from 1986 to 1989. As appears from his handwritten notes and related correspondence,

Forsyth was aware of the Medieval Times company early in 1986, prior to purchase of the California castle.

In May 1986, Forsyth met with representatives of the Medieval Times companies at C&L in Los Angeles. During the numerous meetings that occurred, Forsyth met primarily with Santandreu, Jeronimo Onate (Onate), and A. Gelabert. Santandreu and Onate represented the Medieval Times companies and Gatetown or Manver or both. Kenneth H. Kim (Kim) was employed at C&L as a tax manager and assisted Forsyth in the representation and meetings.

During a May 20, 1986, meeting, the then-existing structure of the Medieval Times companies was reviewed with Forsyth. Forsyth began to design methods intended to improve the corporate structure of the Medieval Times U.S. entities. Forsyth thought the "branch profits tax" in the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, would make the existing structure of Medieval Times undesirable.

Forsyth took notes at these meetings. Notes dated May 20, 1986, contain the following references: "Royalties. Recommend trademark attorney. None registered. Which company should own trademark - where? Copyright - Which Co.? 3 Spanish nationals 'own'. (Florida Co. Not now paying royalties)". The notes also state: "Trademark - offshore. Objective: 10% [royalty] of pre-tax [profit]. Problem: Ownership of intangibles." Additionally, the notes reflect that the Spanish operation

trained the Florida personnel and provided technical and logistical support but that the structure was set by the Florida operation, which sent people to California. Regarding a license agreement, the notes state: "License agreement from foreign corp. to NV-Florida for UK Co.?"

Forsyth wanted to determine a method to make payments to the Spanish investors while incurring a minimum amount of U.S. tax. Forsyth developed a plan that he outlined in a letter to Santandreu dated June 4, 1986. Forsyth recommended that the Spanish investors set up a domestic corporation to operate the Florida and California castles and utilize a three-tier corporate operating structure. Specifically, he recommended that MTNV cease operating in the United States, transfer its assets to a Dutch or other nationality subsidiary, and then have the subsidiary transfer its assets to a new operating company incorporated in Florida.

Before Forsyth finalized his plan for corporate restructuring, he was waiting for a final ratification of an income tax treaty between the United States and The Netherlands. Forsyth suggested that using a Dutch company as the intermediate tier would have advantages. Forsyth recommended the use of section 351 to transfer the assets from the Netherlands Antilles corporation to the intermediate-tier Dutch corporation and then from the Dutch corporation to the new domestic operating company.

Gordon Thring (Thring) worked in the C&L Los Angeles office. He drafted a letter to Santandreu based on conversations he had with Forsyth. The letter to Santandreu was marked "September draft", and it stated that C&L had reviewed the advice from the June 4, 1986, letter to take into account recent tax code changes and the recently signed income tax treaty between the United States and The Netherlands with respect to the Netherlands Antilles. The letter affirmed C&L's recommendation for Medieval Times to use a three-tier corporate structure as suggested in the June 4, 1986, letter. The ostensible advantages of the three-tier structure included limiting U.S. withholding tax to 5 percent for dividends paid to Dutch companies and zero percent for interest paid to Dutch companies, and dividend income from the U.S. company would be tax-exempt in The Netherlands.

A section in the September draft letter discussed royalty payments on intangible assets. The letter stated: "We understand that it is intended to license M.T.U.S. [Medieval Times U.S.] to use the 'Medieval Times' concept and any material that may be copyrighted." C&L suggested the use of a Barbados company to license the intangibles to a Dutch company that would in turn license them to the Medieval Times U.S. companies. C&L stated that the advantage to this arrangement was that the royalty income would not be subject to withholding tax in the United States or in The Netherlands.

Forsyth responded to a request from Santandreu in an October 8, 1986, letter that summarized the reasons C&L was recommending the changes to the Medieval Times corporate structure.  C&L stated that the problems with the current structure were that a 30-percent withholding tax would apply to royalty payments from MTNV and MANV and that a 30-percent branch profits tax would apply on earnings and interest deemed distributed by the existing Netherlands Antilles companies to nonresidents.  C&L's recommendation included transferring existing operations and real estate to U.S. corporations owned by Dutch holding companies that would in turn be owned by the existing Netherlands Antilles companies.  The recommendation also included borrowing in the United States to the maximum extent possible through mortgage loans and working capital to maximize tax benefits, with the funds used to pay dividends and/or reduce capital prior to implementation of the reorganization and prior to the effective date of the new tax act.  The result would be to reduce the tax rates for interest from 30 percent to 8.7 percent, for royalties from 30 percent to 2.94 percent, and for dividends from 53.8 percent to 43.9 percent.

The October 8, 1986, letter also included a list of things to do to implement the plan, which included determining the entity to own the intangibles (trademarks, copyrights, etc.) and completing licensing agreements; implementing a borrowing strategy; and targeting a completion date of December 31, 1986,

or a November 30 fiscal year for MANV and Calinvest to delay the effect of the 1986 Tax Reform Act with respect to the 30-percent withholding tax.  Forsyth listed the information that was required as soon as possible, which included balance sheets; profit and loss statements; profit forecasts; recent tax returns; a listing of all agreements, licenses, etc., that would need to be transferred to the new U.S. subsidiaries; and details of the shareholdings of the Netherlands Antilles companies.  Forsyth needed the information to prepare a tax benefit forecast and a final version of the detailed letter he had reviewed with Santandreu.

During October 1986, it had not yet been determined who would own the intangibles.  While C&L, with the Spanish investors' knowledge, was drafting documents that named Manver as the "licensor" of the intangibles, the Spanish investors were also taking steps to have Gatetown own the intangibles.  In an October 22, 1986, letter from Harris, the United Kingdom accountants, to "The Directors, Gatetown Limited, Euritor", Harris stated their understanding of the current situation and the proposed steps to be taken with regard to the setting up of the trading operation of Gatetown Limited in the United Kingdom. The letter included the following information:

> An "NV" Corporation exists with 20% of that Corporation
> being owned by Spanish individuals and 80% by 7 "arms-
> length" "NV" Companies.  * * * Gatetown Limited has
> agreed to buy the United States and Canadian copyright
> and Royalties from a Spanish Corporation in respect of

"Medieval Times" and this purchase will be financed by loans from the 7 "NV" Corporations.

The letter also noted that the two shares of Gatetown stock had been increased to 100 shares with 50 each being held by Mayol and de Oteyza.

Jon Edwin Hokanson (Hokanson) was an intellectual property specialist with the law firm of Lyon & Lyon (LL) in Los Angeles. Hokanson was drafting licensing agreements between Manver and MTNV for the use of the intangibles. At this time, however, it was still uncertain who would "own" the intangibles that were being licensed. Hokanson spoke with Forsyth on November 7, 1986, regarding the licensing agreement. In a letter to Forsyth dated November 11, 1986, Hokanson enclosed a new draft of the licensing agreement. The new draft expanded the scope of services provided to the licensee to include the right of the licensee to engage in a business system, in addition to the right of the licensee to use the servicemark. Hokanson believed that the transaction fell within the California Franchise Law, and he had already advised A. Gelabert of that opinion. Hokanson stated that he was forwarding a copy of the revised licensing agreement to A. Gelabert.

In addition to Hokanson, Forsyth spoke to Santandreu on November 7, 1986. In a November draft of a letter to Santandreu, Forsyth recapped a November 7, 1986, conversation and supplied further details on the proposed structure of Medieval Times.

Among other items, the letter specifically addressed the choice of entity to own the intangible assets and the question of an appropriate royalty and management fee rate.  The letter noted that Manver currently owned the intangibles and should license them to MANV and MTNV for the current year.  During the current year, Forsyth believed that only 20 percent of the royalties would be subject to tax.  Forsyth suggested that a new licensing structure be implemented once the three-tier system was in place.

Forsyth stated in the draft that, as they had previously discussed, a "super royalty" fee could be justified if above-normal profits were due to the nature of the intangible asset.  Forsyth discussed the new provisions to section 482 in the 1986 Tax Reform Act, supra, and stated, among other things:

> To set the appropriate royalty rate would require a detailed analysis of the worth of the intangible asset and the effect of the intangibles on the profitability of the two operating entities.  * * *  As a working guide, perhaps a rate somewhere between 10-15% would seem reasonable.  However, before a rate is decided upon, we will require further consultations with you.

> It is important in justifying this high rate that the franchise agreement between the owner of the intangibles and the U.S. operating entities detail precisely the distinctive type of restaurant and entertainment services being franchised as the "Medieval Times concept".  We consider that the draft franchise agreement forwarded under cover of Lyon & Lyon's, Attorneys, letter of November 11, 1986 is appropriate subject to a few general comments.  We consider that reference should be made to the script document (as amended), called the "copyright book", which details the sequence of the performance.  In addition, we consider that the agreement should specify some of the services that the licensor shall provide to the licensee.  This will include such things as

assistance in the design of costumes and training of horses and actors.  Finally, we consider that the license should be an exclusive license for a limited area (e.g. Orange County, California) rather than the nonexclusive license for the whole of the U.S. as is in the current draft agreement.

The retention by the licensor of quality control powers, extensive cancellation rights and the right to sublease in the U.S. will assist the argument for a super royalty.  These all point to the licensor retaining control of the future marketing, development and profitability of the licensed concept.

We consider that the proposed widely worded franchise agreement will restrict the basis on which a management fee may be charged.  However, it is still possible to enter into an independent management agreement and to charge a separate management fee.  We suggest that such a fee be limited to either a cost plus basis or a relatively low rate, say no more than 2% of gross revenue.  We emphasize that the services provided should go beyond the normal stewardship functions that shareholders may exercise.  These include ensuring that the information provided to shareholders is adequate and even the selection of senior personnel.  The management agreement should emphasize services that a independent management consultant may provide such as detailed advice on:

> (i) the accounting and administration system;

> (ii) a financing strategy; and

> (iii) personnel selection at all levels.

We do not recommend charging a separate management fee on top of a "super royalty" under the proposed franchise agreement.  However, if you wish to have a separate management fee charged to the U.S. operating companies, we would appreciate the opportunity of reviewing the draft agreement prepared by your attorneys.

The draft listed actions that needed to be completed, including actions that needed to be commenced immediately after a November 20, 1986, meeting.  The matters that still needed to be

resolved included the ownership of the intangible assets and licensing structure and clarification of the process of transferring the intangible assets to the owner; the royalties and management rates and contents of the supporting agreements; and the method by which it was intended to repatriate the "royalty" income to the beneficial owners of intangible assets, who C&L understood were largely Spanish residents.

Louis deVries (deVries) was working with Medieval Times at the C&L office in The Netherlands. deVries met with Santandreu and Onate on November 19 and 20, 1986. At the meeting, they discussed the "draft version of Ian Forsyth's letter". Santandreu and Onate had specific questions about certain items in the letter. Santandreu was of the opinion that the suggested 10- to 15-percent royalty rate discussed in the draft letter should be calculated on gross income.

On December 9, 1986, Forsyth sent to deVries a memorandum stating that C&L and Medieval Times had decided to use Manver to hold the intangibles and to go ahead and try to get a tax ruling for Manver from the Netherlands Antilles. Forsyth promised deVries that he would forward a timetable of all of the actions to be taken on behalf of Medieval Times in the next few days.

On December 11, 1986, the C&L office in the Netherlands Antilles sent a letter to the Netherlands Antilles Inspector of Taxes. The letter stated that Manver was going to be receiving royalties from two NV companies that were operating amusement

parks in the United States.  C&L wanted a ruling that only 20 percent of the royalties paid to Manver would be subject to tax.  C&L received the favorable ruling on Manver on January 13, 1987.

On December 12, 1986, C&L received documents from Medieval Times for the first time.  The documents represented, among other things, that the Medieval Times organization was a franchise. Onate sent copies of six documents to Forsyth, only one of which was signed.

The first document, dated January 20, 1983, purported to create a joint venture between Eurotor and TM.  Although it discussed payments to be received from MTNV, MTNV was not a party to the agreement.  The stated purpose of the agreement was to join TM and Eurotor together with the object of providing to MTNV:

> the right to use the FORMULA created to put in motion and exploit the DINNER-SHOW and TOURNAMENT, THAT IS DEVELOPED IN A MEDIEVAL ATMOSPHERE, for such end, the necessary information will be ceded to MEDIEVAL [MTNV] for the organization, ambientation and launching, through an operations manual in which all will be duly detailed, likewise the orientations and consultations that might proceed the construction of the castle where the FORMULA will be promoted, administered and managed.

The document initially established the same fee arrangement as in the January 24, 1983, contract that Allen drafted, 2 percent of the total estimated cost of the facility during the creation and development stages (for a total of 4 percent) and 50 cents per client when the castle is operational.  The document

provided for payment by MTNV to Eurotor and TM jointly "but it will be exclusively EUROTOR that will have the rights to them during the entire time that this contract might last".

The document then varied from the January 24, 1983, document in that it further stated that, once MTNV had "achieved a daily average, in the last fiscal year, of 700 clients", Eurotor and TM would separate, "nullifying, with all effects, their merger." After the separation, TM was to receive from MTNV 10 percent of MTNV's "gross production". TM was to take "exclusive charge of technical assistance, not management." TM was to contribute to MTNV the use of the name, trademark, and idea; the handbook or formula; all of its experience with respect to choreography, lights, and sound; the making and maintaining of the costumes and wardrobe; all that is relevant to the equestrian section of the program; all that is relevant to the fights, duels, and selection and control of the weapons; its knowledge with respect to the serving of food and drink (catering); an assessment with respect to the promotions and publicity; and effect a "persual [sic]" and control of quality and advise on the modifications that ought to be carried out to which MTNV would always be heedful.

Eurotor was to contribute to MTNV its "experience in the management of companies", including finance, administration, and personnel. The document further stated: "By express desire of EUROTOR and TORNEOS [TM], it is put in evidence that TORNEOS [TM] is the exclusive owner of this FORMULA, that in other countries

is named Franchising." The document listed Santandreu as the representative for Eurotor and J. Montaner as the representative for TM.

The second document was a copy of the January 24, 1983, contract that Allen drafted, discussed earlier. It was the only signed document.

The third document was dated February 1, 1983, and titled "CONTRACT BETWEEN TORNEO MEDIEVALES S.A. AND MEDIEVAL TIMES N.V." This document purported to bind MTNV to the 10 percent of gross production to which Eurotor and TM agreed in the January 20, 1983, agreement. It provided for TM to license to MTNV, for a period of 5 years beginning February 1, 1983, "that the latter may use the name of MEDIEVAL TIMES, trademark, idea, guide and operations manual, which are the property of TORNEOS [TM] in the territory of the United States of America and Canada, of the DINNER SHOW, OF A MEDIEVAL THEME WITH TOURNAMENTS OF THE SAME PERIOD, (herein called 'FORMULA')".

MTNV would be required to pay to TM 10 percent of its gross income beginning when MTNV reached a daily average of 700 clients per day, as set forth in the January 20, 1983, joint venture agreement between TM and Eurotor. TM was to assist MTNV with choreography, design and upkeep of the costumes and accessories, the equestrian part of the show, fights and duels and selection and control of the weapons, and catering (system of preparing and serving meals). TM was also to be responsible for

quality control.  MTNV "promises to respect all the rules and standards registered in the FORMULA (<u>and operations manual</u>) of which it will have received the relevant copy from TORNEOS [TM]".  J. Montaner was listed as the representative for TM and A. Gelabert as the representative for MTNV.

The fourth document was dated May 26, 1986, and was an agreement between Manver and TM whereby TM "is the owner of the Idea, the name MEDIEVAL TIMES, Trademark, Guide and Operations Manual of the DINNER-SHOW, OF A MEDIEVAL THEME WITH TOURNAMENTS OF THE SAME PERIOD, (hereinafter 'FORMULA')".  The document referred to the February 1, 1983, agreement between TM and MTNV and stated that, as of the date of this agreement, May 26, 1986, the 700-client per day average had not yet been reached.  It further recited:

> [TM] acquired great and grave responsibilities with respect to the services loaned for the granting of the LICENSE to MEDIEVAL TIMES N.V. and in view of the growth of MEDIEVAL TIMES N.V. and through the pertinent studies, the following conclusions have been reached that
>
>> a.  by its own means it will be impossible [for TM] to comply with its obligations of the contract, if this should occur.
>>
>> b.  obtaining these means through a third party would be highly costly and will produce little profit.
>
> 7.  Whereas considering the aforestated the decision has been taken to SELL to MANVER all the rights of the FORMULA, in the territory of the United States of America and Canada.

As of January 1, 1988, Manver was to pay to TM 1,000,000 pesetas. TM was to "deliver, authentically, the name, trademark and hand-book of the FORMULA to MANVER, in the act of signing this contract." The contract was not signed. The representatives were J. Montaner for TM and Mayol for Manver, and the parties were to have been assembled in Alfaz del Pi, Spain.

The fifth and sixth documents were purportedly management contracts between Eurotor and MANV and Eurotor and MTNV, respectively. The Eurotor and MTNV document was dated August 1, 1986, and named Sans as the representative for MTNV and Santandreu for Eurotor. It stated that, as of July 31, 1986, the joint venture between Eurotor and TM (the January 20, 1983, agreement) was terminated. The document referred to the January 24, 1983, management agreement between Eurotor and MTNV that was drafted by Allen and stated that the management assessment provided to MTNV by Eurotor continues to be "essential" to MTNV. MTNV agreed to pay to Eurotor, effective August 1, 1986, for a period of 1 year, 2 percent of its gross production. Eurotor was to provide, among other things, assessment on finance, administration, marketing, licensing and franchising, personnel, and budgets. These services, allegedly provided under the January 24, 1983, management agreement, were the same services Forsyth specified in his November 1986 draft letter to Santandreu.

The management agreement between Eurotor and MANV was dated February 1, 1986, and named as representatives A. Gelabert for MANV and Segui for Eurotor.  It did not mention any of the other agreements but provided for the same arrangement, i.e., 2 percent of gross production with a 1-year duration.  The services that Eurotor was to provide were the same as in the agreement with MTNV.

There were additional documents related to TM, Eurotor, Gatetown, and Manver that were dated 1986 but not provided to C&L in 1986.  There were also documents dated 1986 that were actually drafted sometime during 1987 and later.  Two documents, both in Spanish, reflect a sale by TM to Gatetown of the Medieval Times formula.  TM was to deliver, pursuant to the sale, the name, trademark, and handbook of the formula to Gatetown.  The two documents are virtually identical in language and terms, and both are dated March 1, 1986.  The only difference is that one document reflects a sales price of $7,312 and is signed by Mayol for Manver and by J. Montaner for TM.  The other document reflects a sales price of 3,000,000 pesetas (approximately $26,000) and was not signed.  The language in both documents, except for the sales price, was the same language in the document provided to C&L on December 12, 1986, that purported to represent a sale of the Medieval Times formula from TM to Manver for 1,000,000 pesetas.

An unsigned letter dated March 1, 1986, notified MTNV that TM had sold its rights to the Medieval Times formula to Gatetown. The letter was addressed to the attention of A. Gelabert.

Two letters dated May 27, 1986, on Manver stationery, notified MTNV that Manver had purchased the rights to the Medieval Times formula.  Both letters referred to the document between MTNV and TM dated February 1, 1983.  One letter, addressed to Sans, was in Spanish and informed MTNV that Manver purchased the formula from TM.  It was signed by Mayol for Manver.  The other letter, addressed to Sans, was in English and informed MTNV that Manver purchased the formula from Gatetown. It was signed by Mayol for Manver and by Sans for MTNV.

A Bill of Sale, dated May 27, 1986, purports to represent a sale from Gatetown to Manver of all the rights to the "patent, trademark, copy right, trade secret, contracts, * * * including the goodwill, services, production, advertising, distribution, marks, ideas, concept, operations manuals, show scripts, and the name MEDIEVAL TIMES, which are identified by the marks 'MEDIEVAL TIMES' and 'MEDIEVAL TIMES WITH DESIGN'."  The sale was in consideration of 200 shares of stock and an obligation to pay $3.8 million (U.S. dollars) for a total value of $5.6 million. The $3.8 million was to be paid in five annual installments of $760,000 each, with the first payment commencing on June 1, 1987. The document was signed by Mayol for Gatetown and by Nouel (an attorney at CANV) for Manver.

An annex to the Bill of Sale between Gatetown and Manver provided that the annual installments of $760,000 beginning June 1, 1987, should have added to them simple interest of 9 percent per year payable monthly on the outstanding balance. The document was dated June 30, 1986, and was signed by Mayol for Gatetown and by Onate for Manver.

An agreement dated July 25, 1986, between Eurotor and MTNV purported to amend the January 20, 1983, document notwithstanding that MTNV was not a party to the January 20, 1983, document. The original construction on the castle had been completed prior to the castle's opening in December 1983, 2-l/2 years before July 1986. The amendment was allegedly necessary because "the scheduled time to finish the constitution [sic] was delayed for about six months or more. The two parties agree that because of the reasons mentioned above instead of an accrued 4% as seen in the agreement signed of 1/20/83, it would be 10% (ten) of the total estimated cost of the facility." The agreement was signed by Sans for MTNV and by Santandreu for Eurotor.

Manver purportedly entered into licensing agreements with MTNV and MANV in 1986. Both documents granted the licensees (MANV and MTNV) the exclusive right to use the licensed services described as "the Licensed Servicemarks and the Distinctive Services in connection with the sale, offering for sale and advertising of restaurant and entertainment services using the Distinctive Services". Both documents required that the

licensees pay to Manver a royalty fee equal to a percentage of the total gross sales derived from the services listed thereunder, with the percentage established as 10 percent for the first year, 12.5 percent for the second year, and 15 percent for each year thereafter. The percentages were within the range suggested by Forsyth in the November 1986 draft letter. The draft letter was prepared several months after the date placed on the licensing agreements. The agreements were for a duration of 5 years.

The MANV licensing agreement was dated May 27, 1986, with payments beginning November 30, 1987. The MTNV licensing agreement was dated August 1, 1986, with payments beginning July 31, 1987. Both documents stated: "The first payment is due 183 days after commencement of operations by LICENSEE." The MTNV agreement was signed by Mayol for Manver, Sans for MTNV, and Watson as a witness. Watson dated his signature March 30, 1987. The MANV agreement was signed by Mayol for Manver and by A. Gelabert for MANV. The language in both of the documents was substantially identical to the language in the draft of a licensing agreement prepared by Hokanson and forwarded to Forsyth on November 11, 1986, which was several months after the date of the licensing agreements. The differences between Hokanson's drafts and these two licensing agreements were the parties' names, dates, and payment terms.

Gatetown's stock was held by de Oteyza and Mayol into 1987.

Futureprom, N.V. (Futureprom), was a Netherlands Antilles entity incorporated on or about June 10, 1982.  On June 10, 1987, Onate sent a letter to Sans requesting that Sans check to see if Allen had the share certificates and articles for Futureprom.  On August 17, 1987, the two shares of Gatetown were transferred from de Oteyza and Mayol to Lince and Futureprom.  Lince and Futureprom each received one of the two Gatetown shares.  On the same date, de Oteyza resigned as a director of Gatetown and was replaced by Onate.  After de Oteyza and Mayol transferred their stock, the owners of Gatetown, through their ownership of Lince and Futureprom stock, were Attractours (J. Montaner), Dapy (Kahne), Holiday (Segui), Roundabout (Santandreu), Spectrust (Valiente), Wayout (Climent), Promidux (P. Montaner), Primavert (Santandreu), and Chavez.

Harris sent correspondence to "HM Inspector of Taxes" in London that detailed Gatetown's activities.  Among the documents were the Bill of Sale from Gatetown to Manver of the rights to the Medieval Times concept and the annex that added the interest payment.  Three additional documents were enclosed.  The documents attempted to bind Gatetown to pay 95 percent of the payments it received from Manver to Lince and Futureprom.  The first agreement stated:

> In consideration of the receipt of 10.968 dolars, being an unsecured loan, with no interest or fixed repayment date, GATETOWN LIMITED, the borrower agrees to pay FUTUREPROM, N.V., the lender, 95% (ninety-five) of any future royalties, franchise fees, sale proceeds or any

> other income or interest whatsoever arising from the purchase by GATETOWN LIMITED of the rights to TORNEOS MEDIEVALES, S.A. OF ALL PATENT, TRADEMARK, COPYRIGHT, * * * INCLUDING THE GOODWILL, SERVICES, PRODUCTION, ADVERTISING, DISTRIBUTION, MARKS, IDEAS, CONCEPT, OPERATION MANUALS, SHOW SCRIPTS AND THE NAME MEDIEVAL TIMES, WHICH ARE IDENTIFIED BY THE MARKS "MEDIEVAL TIMES" AND "MEDIEVAL TIMES WITH DESIGN", which it [Gatetown] has today purchased by the assistance of the above mentioned loan from * * * [FUTUREPROM].

The document was dated February 26, 1986, and was signed by Mayol for Gatetown and by Nouel of CANV for Futureprom.

The second document was almost identical to the first document except that the loan was from Lince to Gatetown for "21.936$ dolars". The remaining terms and conditions were the same. It was dated February 26, 1986, 3 months before Lince was incorporated. It was signed by Mayol for Gatetown and by Segui for Lince.

The third document referenced the first and second documents and provided that, in consideration of the loans provided to Gatetown by Lince and Futureprom whereby Gatetown agreed to pay 95 percent of any royalties, franchise fees, etc., to Lince and Futureprom, Gatetown was now agreeing to pay to Lince 95 percent of all of the income received from Medieval Attractions, N.V. (Buena Park, U.S.A.), and to pay to Futureprom 95 percent of all of the income received from Medieval Times, N.V. (Kissimmee, U.S.A.). The document was signed by Segui for Lince and by Nouel for Futureprom. It was dated June 1, 1986.

Gatetown's existence was reflected in other documents maintained by Harris, including a copy of the Spanish version of the agreement whereby TM sold its rights to the Medieval Times concept to Gatetown for 3,000,000 pesetas. The "loans" from Lince and Futureprom totaled $32,904.

Another document in Harris' possession was titled "Gatetown Limited Accounts for the Period Ended 30th April 1988". That document contained the following:

PRINCIPAL ACTIVITY AND BUSINESS REVIEW

The principal activity of the Company is that of owners of royalty and copyright agreements.

The Company acquired the rights to certain trade marks, patents etc. which were transferred and assigned to the Subsidiary Company [Manver] in exchange for the entire issued Share Capital (the Subsidiary Company not having any assets or liabilities previously) in addition to an obligation to pay to the Company $760,000 each year for 5 years.

The Company is under obligation to its two shareholders Futureprom N.V. and Lima [sic] N.V. to pay 95% of its income to the two Companies.

The Company has had a satisfactory year and looks forward to the future with confidence.

The document listed as Gatetown's 1988 assets: $1.8 million as "Investment in Subsidiary" and $3,131,200 as "Amounts owed by Subsidiary Company".

The October 8, 1990, letter from Harris to "HM Inspector of Taxes" included the following information on royalty payments by Gatetown:

|                  | 1988         | 1989         |
|------------------|-------------|--------------|
| Futureprom N.V.  | $  786,085  | $1,678,138   |
| Lince N.V.       | 1,172,763   | 3,735,209    |

Manver International, C.V. (MICV), and Manver Global, B.V., were incorporated in 1990.  Santandreu and Onate were members of MICV's Executive Committee.  Lince and Futureprom each owned 48.5 percent of MICV stock.  A document dated October 17, 1990, purported to transfer from Manver to MICV:

> all world wide rights to the intellectual property and franchising rights with respect to the idea, concept and Operating Manuals concerning a Dinner and Tournament Show Restaurant in medieval style and/or villa's Medieval style under the names "Medieval Times" and/or "Medieval Life", and all related rights including but not limited to trademarks, tradenames, copyrights, goodwill, licenses and physical ownership of documents embodying any right of intellectual property and franchising rights etc., hereinafter referred to as "The Intellectual Property" * * *

In consideration of the sale, MICV agreed to pay to Manver $64.1 million by "way of two promissory notes which will be issued upon signature of this agreement."  The document was signed by Onate for Manver and by Santandreu for MICV. Subsequently, a 1990 financial statement for MICV reflected a $64.1-million note payable.  In 1991, the $64.1 million was reflected as capital stock.

VI.  Trademarks and Copyrights

In December 1982, Castro filed an application for a post office box in Kissimmee, Florida, in the name of Medieval Times. The name Medieval Times had not been used previously in the

United States or Spain.  In December 1983, A. Gelabert filed an
application for a business license with the State of Florida.
The business name on the application was Medieval Times.  From
1983 to 1987, the Medieval Times trademark and logo continued to
evolve and the stationery and business cards bore different
lettering styles and designs.  The Rocaberti shield was used in
some instances, and, in other instances, a picture of a castle
was used on stationery.

Hokanson, at LL, performed trademark and copyright
registration work for the Medieval Times companies in 1986 and
1987.  Originally, MANV was identified as the client.  Invoices
for LL's services on October 24, 1986, and May 22, 1987, were
sent to MANV in Buena Park, California.  Hokanson relied on the
information provided to him by A. Gelabert, Forsyth, Santandreu,
and Onate with regard to the ownership of the trademark.
Hokanson made no independent inquiries into the ownership of the
trademarks.

A letter dated October 17, 1986, from A. Gelabert to
Hokanson stated:  "Names of corporation which will register the
trademark of Medieval Times will be GATETOWN LTD. (Limited),
incorporated in England on June 22, 1985."

LL filed to register the marks "Medieval Times" and
"Medieval Times with Design" in California and Florida in
February 1987.  The Medieval Times mark consisted of the words
"Medieval Times".  The Medieval Times with design mark consisted

of the words "Medieval Times" and the Rocaberti shield. The California marks were successfully registered in California in May and October 1987. The Florida marks were successfully registered in March 1987. The applications for California and Florida named Manver as the applicant.

LL applied to register the marks with the U.S. Patent and Trademark Office in September 1987. The marks were successfully registered in November and December 1988. The applications named Manver as the applicant. In January 1989, Onate sent a letter to Sans stating that the new registered marks should be included on all documents printed in the future. In February 1989, Sans informed Bellows about the requirement to include the registered marks on all future printing.

## II. Section 351 Transfers

As part of the plan to restructure the Medieval Times companies, C&L prepared a valuation of the tangible and intangible assets of Medieval Times. As of January 31, 1987, C&L concluded that the fair market value of MANV's assets was $6,174,800 and the value of MTNV's assets was $4,358,380. The amount of fair market value attributed to goodwill was $5,582,577 for MANV and $3,670,936 for MTNV. The valuation reports stated:

> Goodwill is defined as that favorable disposition which customers entertain toward a particular enterprise which may induce them to continue giving their patronage to it. The existence of goodwill of an enterprise is evidenced by earnings in excess of those normally encountered in that company's particular industry.

Information about the valuations was provided to A. Gelabert in letters dated March 1987.  The letters also stated:

> We define fair market value as the price at which property is exchanged between a willing buyer and a willing seller, neither being under compulsion to act and both having reasonable knowledge of relevant facts and market conditions.  Our estimate of fair market value does not reflect synergies and efficiencies that a specific buyer may contribute.

In a November 16, 1987, letter, C&L advised A. Gelabert that the fair market value of MANV as of September 30, 1987, had increased to $14 million.  C&L valued MANV goodwill as of September 30, 1987, at $13,696,767.  The companies that C&L used as comparables in its valuation included TGI Friday's, Inc.; International King's Table; Jerrico; and Vicorp.

MSI was incorporated in Florida by Allen on January 20, 1987.  MDT was incorporated in California on or about August 3, 1987.  MSI and MDT were going to be the U.S. operating companies as required by the C&L plan for a three-tier corporate structure for the Medieval Times companies.

MABV and Medieval Times, B.V. (MTBV), were incorporated in The Netherlands on September 29, 1987, and July 31, 1987, respectively.  MABV and MTBV were to be the middle tier in the three-tier structure proposed by C&L.

Throughout 1987 and until December 12, 1988, the various C&L offices involved in implementing the three-tier restructuring plan corresponded with drafts of agreements, promissory notes, and timetables in anticipation of the section 351 transfers.  In

July 1988, C&L Amsterdam sent to Forsyth drafts of promissory notes that were dated 1987.

The correspondence was dominated by discussions on tax rulings from the Netherlands Antilles. Randolph M. Th. de Cuba of C&L sent letters dated September 30, 1988, to the Inspector of Taxes in the Netherlands Antilles requesting tax rulings on behalf of Manver, MTNV, and MANV. C&L wanted rulings for Manver on the tax treatment of royalties, income, and whether or not interest would be imputed on non-interest-bearing loans. The ruling requests for MANV and MTNV concerned income, dividend income from MABV, and whether or not interest would be imputed on non-interest-bearing loans. The letters also provided that Manver held the shares of MANV and MTNV, that MANV held all of the shares of MABV, and that MTNV held all of the shares of MTBV. C&L received the rulings it desired from the Inspector of Taxes on October 6, 1988. The Inspector of Taxes agreed, among other things, that interest would not be imputed on the specified non-interest-bearing loans.

Some of the documents that purported to effectuate the section 351 transfers were executed no earlier than late 1988, although they were dated 1987. The documents for the Florida side of the double section 351 transactions were dated August 1, 1987, one day after incorporation of MTBV. The documents provided that, on that date, MTNV ceased doing business and transferred its assets and business, subject to its liabilities,

to MTBV for a total consideration of $4.4 million (U.S.).  Of this amount, 1.723 million Dutch Guilders was paid in stock of MTBV, 1.953 million Dutch Guilders was paid in an interest-bearing note, and $2.64 million (U.S.) was paid in a non-interest-bearing note.  The 1.953 million Dutch Guilders note was payable in 10 years upon presentation of the note.  The interest was payable on the Dutch Guilders note quarterly at a rate of 9.5 percent, with the principal due in 10 years upon presentation of the note.  The non-interest-bearing $2.64 million loan was "payable in ten years on presentation of this promissory note".

MTBV immediately transferred the assets and business it received from MTNV to MSI for a total consideration of $4.4 million.  Of the $4.4 million, $1.1 million was paid with MSI stock and $3.3 million was paid with a negotiable interest-bearing promissory note.  The terms of the promissory notes varied among the drafts from 5 years to 10 years.  Interest at a rate of 9.5 percent was to be paid quarterly, with the principal due at the end of the term of the note.

The documents for the California side of the double section 351 transaction were dated December 1, 1987.  The documents recited that, on that date, MANV ceased doing business and transferred its assets and business, subject to liabilities, to MABV for a total consideration of $14 million (U.S.).  Of the $14 million, 4,879,875 Dutch Guilders was paid in stock of MABV.

MABV issued an interest-bearing note in the amount of 5,530,525 Dutch Guilders with 9.5-percent interest due quarterly and the principal due in 10 years on presentation of the promissory note. MABV also issued a non-interest-bearing note for $8.4 million (U.S.) that was payable in 10 years upon presentation of the note.

MABV immediately transferred the assets it received from MANV to MDT for a total consideration of $14 million. Of this amount, $3.5 million was paid with MDT stock and $10.5 million was paid with an interest-bearing note. The interest-bearing note had a rate of 10 percent. The interest was due quarterly, and the principal was due in 5 years.

After the section 351 transfers, MTNV held all the stock of MTBV, which held all the stock of MSI. MANV held all the stock of MABV, which held all the stock of MDT. The C&L September 30, 1988, letter to the Inspector of Taxes stated that Manver held all the shares of both MANV and MTNV.

MSI and MDT signed licensing contracts with Manver that were substantially the same as the Manver-MTNV/MANV contracts. The MSI and MDT documents were dated August 1, 1987, and December 1, 1987, respectively. MSI and MDT signed new management contracts with Eurotor dated August 1, 1987, and December 1, 1987, respectively.

VIII.  California and New Jersey Expansion

A.  California

The Medieval Times group began to expand its operations.  On December 15, 1987, Glendale Castle, Inc. (GCI), was incorporated in California.  GCI filed 1987 (fiscal year December 23, 1987, to November 30, 1988) and 1988 Federal tax returns that stated that GCI was an inactive corporation.  GCI's articles were amended on December 13, 1988, to change the name of GCI to the San Diego Castle, Inc. (SDCI).  The amendment stated that it had been approved by the board of directors.  In December 1988, GCI/SDCI entered into a lease, signed by A. Gelabert, for vacant land in Carlsbad, California.  A. Gelabert also signed papers in the name of GCI/SDCI on an application for a change of zoning to accommodate the new castle facility and on an agreement for the payment of a public utilities fee.

MDT maintained an account entitled "Advances - San Diego Castle".  The first entry was June 15, 1988, and the last entry was November 30, 1990.  The expenses included payments to the City of Carlsbad, C&L, an engineering company, and marketing fees to RC.  MDT deducted these expenses on its Federal tax returns in the amounts of $18,633 and $128,775 in 1988 and 1989, respectively.

In December 1989, after the Carlsbad Planning Commission denied GCI/SDCI's project because of traffic problems, GCI/SDCI withdrew its application from the planning commission.  A

planning commission letter dated December 14, 1989, accepted the withdrawal.  The letter also listed previous actions related to the application, including that the commission had passed a motion on October 18, 1989, to discuss the traffic issues associated with the application.  After the December 14, 1989, letter, Taylor, with Santandreu's knowledge, continued to look for sites in San Diego on which to build a castle.

A document entitled "Resolution of the Board of Directors of Medieval Dinner & Tournament, Inc." resolved that the corporation (MDT) immediately abandon the Carlsbad project "considering the fact that the corporation failed to get the necessary approval by the Carlsbad Planning Commission".  It was dated October 17, 1989, Palma de Mallorca (Spain), and was signed by Santandreu, A. Gelabert, Segui, P. Montaner, Kahne, and Climent.

B.  New Jersey

In December 1987, Meadowlands Castle Inc. (MCI) was incorporated in New Jersey for the purpose of opening a castle in New Jersey.  MCI retained a New Jersey law firm to represent it before various city, county, and State authorities.  By this time, Watson was working for the Medieval Times companies and had an ownership interest in MANV through Estaspan.  Watson went to New Jersey to assist with the development.  He opened bank accounts at National Community Bank (NCB) in New Jersey in MCI's name; made a presentation to the City Council of Lyndhurst, New Jersey; and negotiated with a landlord for a lease in the name of

MCI. On July 20, 1988, A. Gelabert directed the Australia and New Zealand Bank (ANZ Bank) to transfer $45,000 from the "Wayout dividend account" to MCI's account at MCI's New Jersey bank. MCI had several accounts at NCB. MDT transferred money to MCI accounts, including a $100,000 transfer on April 12, 1988, and a $127,000 transfer on September 15, 1988. MCI maintained an insurance policy in its name.

In September 1988, Watson, on behalf of MCI, obtained a letter of credit from ANZ Bank for $325,000. In December 1988, Santandreu, A. Gelabert, Segui, P. Montaner, Kahne, and Climent were elected to the board of directors of MCI. On March 20, 1989, A. Gelabert, as MCI president, signed a construction contract to build the New Jersey castle. The New Jersey castle was subsequently built with funds supplied by MDT. Various contracts, invoices, and correspondence continued to use the name MCI after March 20, 1989.

C. C&L Advice

In a letter to Santandreu dated August 31, 1988, C&L responded to Santandreu's questions about equity contributions to MCI. The letter stated that MCI would be owned 87 percent by MDT and 13 percent by minority shareholders. The letter further stated:

> Instead of discussing ways to make equity contributions by respective shareholders, this letter discusses the merits of operating new castles as divisions of MDT rather than separate subsidiaries, at least until the operation at each castle commences.

ISSUE

Can MDT currently deduct the pre-operating expenditures incurred for the Glendale and Meadowlands castles and amortize under IRC Section 1253(d)(2) the franchise rights it acquired from Manver, N.V. (MNV) before the operation at each castle commences?

C&L's letter recited several facts, including: MDT entered into a contract with Manver to amortize franchise rights for MDT, GCI/SDCI, and MCI; GCI/SDCI and MCI were both incorporated in December 1987 to operate castles; GCI/SDCI and MCI were both currently negotiating leases for land to build castles; MCI had already incurred $200,000 in startup expenses, which were paid with advances from MDT and contributions of capital from 13 minority shareholders; it was expected that both sites would incur substantial additional preoperating expenses; and MDT was planning to contribute its capital share (87 percent of $1.5 million) to MCI in the near future.

The letter continued with an assessment of various Internal Revenue Code sections and case law. It pointed out that costs incurred before the actual commencement of a trade or business (i.e., startup costs) are "clearly not deductible since such expenses are not incurred in 'carrying on a trade or business' under IRC section 162." However, it noted that expansion costs incurred by an ongoing business enterprise are incurred in "carrying on a trade or business" under section 162 and will therefore be currently deductible as long as they are not capital expenditures.

With regard to the deduction for the amortization expense, C&L noted that, for the deduction to be taken, the transferee of a franchise must also be conducting a trade or business. It explained that the trade or business requirement allows deductions for expenses incurred only when business operations commence and activities for which the trade or business was formed are performed. C&L stated that there was an issue as to whether or not a trade or business existed with respect to MCI and GCI/SDCI because the actual operations of the castles would not commence for at least a year.

C&L addressed a resolution for both issues and stated:

However, if we assume that both MC [MCI] and GC [GCI/SDCI] can be operated as divisions of MDT instead of separate subsidiaries, an argument can be made for amortizing the franchise rights before the commencement of operations at MC and GC. It can be argued that MDT acquired the additional franchise rights in order to expand into other territories and as such the amortization of the additional franchise rights are "ordinary and necessary" expansion costs incurred by an ongoing business enterprise in "carrying on a trade or business."

C&L concluded that "there appears to be relatively strong support for deducting pre-operating expenses at MC [MCI] and GC [GCI] and amortizing the franchise rights for the Glendale and Meadowlands sites as long as both castles are operated as divisions of MDT, not as separate subsidiaries." C&L recommended a number of actions, which included:

Operate the two additional castles as divisions of MDT and delay equity contributions to MC [MCI] and GC [GCI] until after the operation commences at each location.

Andres Gelabert indicated that the minority
shareholders would have no objection to this idea.
* * *

      *      *      *      *      *      *      *

Do not treat any of the monies spent already as either
advances to or equity contributions to MC [MCI] or GC
[GCI].  Instead, MDT should treat its advances or
potential equity contributions as divisional
expenditures and the "equity" contributions from the
minority shareholders, if needed, should instead be
treated as loans to MDT which, in turn, were used in
the divisional projects.

## IX. Dividends

MTNV paid dividends from the 1983 through 1985 profits on
January 27, 1986, and May 1, 1986.  The payments consisted of the
following:

| | |
|---|---:|
| Spectrust | $ 31,070.42 |
| Promidux | 45,676.99 |
| Dapy | 45,674.67 |
| Roundabout | 29,413.55 |
| Holiday | 29,413.55 |
| Wayout | 25,892.41 |
| Alfonso Chavez | 12,946.21 |
| Gloria Chavez | 12,946.20 |
| | $233,034.00 |

The payments were approximately in proportion to each payee's
ownership interest in MTNV.

MTNV paid dividends on 1986 profits on October 7, 1986, in
the following amounts:

| | |
|---|---|
| Spectrust | $ 82,200.95 |
| Promidux | 80,151.01 |
| Dapy | 80,151.01 |
| Attractours | 81,830.97 |
| Roundabout | 77,817.47 |
| Holiday | 77,817.47 |
| Wayout | 68,501.82 |
| Gerard Chavez | 12,331.56 |
| Alfonso Chavez | 28,085.13 |
| Gloria Chavez | 28,085.13 |
| | $616,972.52 |

The payments were approximately in proportion to each payee's ownership interest in MTNV.

A. Gelabert, as managing director of MTNV, directed Sans, in a letter dated June 17, 1987, to pay additional dividends.  The dividends were paid in June 1987 as follows:

| | |
|---|---|
| Spectrust | $ 66,665.00 |
| Promidux | 52,502.50 |
| P. Montaner | 12,250.00 |
| Dapy | 52,502.50 |
| Kahne | 12,250.00 |
| Roundabout | 50,610.00 |
| Roundabout | 1,055.55 |
| Santandreu | 12,250.00 |
| Holiday | 50,610.00 |
| Holiday | 1,055.55 |
| Segui | 12,250.00 |
| Wayout | 55,555.00 |
| Attractours | 66,000.00 |
| Gerard Chavez | 9,800.88 |
| Alfonso Chavez | 22,321.51 |
| Gloria Chavez | 22,321.51 |
| | $500,000.00 |

The payments were approximately in proportion to each payee's ownership interest in MTNV.  The 1987 dividends were the last dividends paid by MTNV.  No dividends were paid by MSI from incorporation through at least 1991.

MANV paid dividends once, during the fiscal year ended November 30, 1987.  The dividends totaled $2.5 million.  No dividends were paid by MDT from incorporation through at least 1991.

X.  Marketing Agreement

A 1986 C&L letter addressed to Santandreu, marked "September draft", addressed the best method of "structuring the arrangement between A and B so that profits and losses are shared equally and Company A retains the benefit of appreciation in the property." In the draft letter, C&L pointed out the disadvantages of operating as a partnership and suggested the use of a management agreement:

> A simpler way to structure the agreement and still accomplish the objectives of the property owner would be for MANV to retain ownership of the property and contract with MTNV to manage the project.  Under this approach, if profits and losses are shared equally by the two companies, the possibility exists however, that the Internal Revenue Service could determine that the arrangement is actually a joint venture taxable as a partnership.  Thus, extra care would need to be taken in drafting the management agreement.  For example, a management agreement between MANV and MTNV could be drafted allowing the compensation of MTNV to be based on a percentage of gross receipts, or a percentage of net cash flow (i.e. gross receipts less operating expenses).  Depreciation and amortization would thus be allocated entirely to MANV as property owner.

In 1989, an agreement between MANV and MTNV dated March 4, 1986, was sent to MSI.  The agreement was structured in accordance with the advice that C&L rendered to the Spanish investors in October 1986 and required MANV to pay to MTNV 10 percent of MANV's profits after taxes during MANV's 1986

fiscal year.  The agreement stated that the payment was to be paid in return for services that MTNV provided to MANV regarding the:

> technique in marketing, promotion and publicity of a dinner tournament business, and for taking its representation to assist in fairs, conventions and other mass meetings relating to the business of M.A. [MANV], with enough powers and authorization to contract in the name of M.A., travel agency groups, company groups and others, always under the economical conditions marketed by M.A.

The payment was to be due "not later than one year after the filing by M.A. [MANV] of its 1986/1987 Tax Return to the Internal Revenue Service in the USA."  MANV filed its 1986 Federal tax return on June 7, 1988.

A fax cover sheet dated June 22, 1989, from Onate to Bertha Moreno at MANV/MDT stated:  "We are faxing you the Agreement regarding the invoice of US $236,313.30 for Marketing Consulting between Medieval Times and Medieval Attractions."  Onate sent to Mary Ann Powell at MDT/MANV a letter dated July 3, 1989, in which Onate enclosed a copy of the marketing agreement for her files. MDT/MANV paid to MSI/MTNV $236,313.30 by check dated July 3, 1989.  The check reflected an amount equal to 10 percent of MDT's profits after taxes as stated on MDT's fiscal year 1986 (December 1, 1986, to November 30, 1987) Federal tax return.

XI.  Commercial Paper

During 1987, the U.S. Treasury Department announced its intention to terminate several of the tax treaties that existed between the United States and the Netherlands Antilles.  The

termination would have had an effective date of January 1, 1988.
Because the termination would have affected the Medieval Times
companies, C&L advised them to consider accelerating any payments
that were scheduled to be made to the Netherlands Antilles
companies after January 1, 1988. Among the alleged various
payments that the Medieval Times companies had to make after
January 1, 1988, were amounts under the licensing agreements
between Manver and MDT and between Manver and MSI. Pursuant to
the Manver-MANV/MDT agreement, MANV had paid Manver $1,441,924 as
franchise fees for 1987, but MANV/MDT and MSI purportedly still
owed the balance of the contracts to Manver.

C&L and Santandreu determined that it would be possible for
the licensees (MDT and MSI) to prepay the royalties that were due
under the 5-year licensing agreements. The prepayment plan would
require the licensees to prepay the royalties in a lump sum up
front by financing the prepayment amounts with promissory notes
that allowed the licensee to pay interest only for 5 years, with
a balloon principal payment due at the end of the 5 years.

C&L advised that the lump-sum payment amount would have to
represent the discounted present value of the expected royalty
stream for the prepayment period. The information about the
income stream was provided to C&L by Medieval Times personnel.
In addition to the Florida and California lump-sum amounts,
lump-sum amounts were determined for the New Jersey and
Glendale/San Diego castles, even though these castles were not

operating at the time.  C&L used 3-year income streams on the two nonoperating castles instead of the 5-year income streams used on the operating castles.  The New Jersey and Glendale/San Diego castle amounts were added to the MDT lump-sum amount for a total of $15.75 million.  The MDT discounted present value amounts were computed as:  Buena Park, $9.9 million; New Jersey, $3.15 million; and Glendale/San Diego, $2.7 million.  The lump-sum amount for MSI was $7 million.  Under this plan, MSI and MDT would have collectively given Manver promissory notes for $22.5 million in 1987 and paid interest on the promissory notes monthly.  The principal would have been due in 5 years.

Under the lump-sum plan, MSI and MDT would have been subject to withholding tax on the interest payments to Manver.  C&L therefore suggested that the withholding could be avoided through the use of commercial paper.  C&L advised that there was an exemption in the U.S. tax law that excused the withholding tax on interest on promissory notes (commercial paper) with a term of less than 183 days.

Forsyth dealt primarily with Santandreu and Onate concerning the commercial paper.  The procedure required issuing an initial round of commercial paper (tranche) with a maturity of less than 183 days.  Prior to maturity, the tender panel manager must have the cash available to repay the first tranche.  The cash could come from a new issue of commercial paper, or, alternatively, the tender panel manager could call on the guarantor or the company

to provide additional funds.  Either way, the tender panel manager had to have the cash prior to the maturity of the first tranche to repay that tranche.  Forsyth advised that C&L would like a substantial part of the placement made to unrelated parties but that related parties could be investors in the program.  Forsyth advised that the guarantors should not purchase the commercial paper directly or indirectly.  Forsyth also advised that it would be better for a purchaser holding notes in an expiring round not to purchase notes in the replacement round.

Forsyth inquired about how much cash the Spanish investors could provide as part of the commercial paper arrangement.  At this time, the Spanish investors had $10 to $20 million in their bank accounts.  It was decided that $10 million cash would be provided by the Spanish investors through their controlled Netherlands Antilles corporations.  MSI and MDT were to issue commercial paper sufficient to borrow the $10 million, which would be paid to Manver before December 1987.  The remaining $12.5 million would be financed by the issuance of promissory notes to Manver.  In December 1987, $5 million was transferred from the J. Montaner-controlled entities, primarily Dapy, and $5 million was transferred from the Santandreu-controlled entities, primarily Roundabout, to Gatetown.  On December 22, 1987, MSI and MDT issued negotiable commercial paper promissory notes, in $500,000 increments, to five entities to finance the $10-million payment.  The five entities were companies controlled

by the Spanish investors:  Lince; Protravol; Edemle, N.V.
(Edemle); Attractours; and Futureprom.  These five companies did
not transfer money to MSI or MDT as purchase money for the notes.
The commercial paper notes matured June 17, 1988, because, in
accordance with C&L's form, the notes could not have a maturity
date over 183 days.

On December 29 and 30, 1987, Gatetown transferred $7,136,376
of the $10 million to MDT and $2,854,599 to MSI.  On December 29
and 30, 1987, MDT transferred $6.9 million cash and issued three
negotiable promissory notes totaling $8.6 million to Manver.  MSI
transferred $3.1 million cash and issued a negotiable promissory
note in the amount of $3.9 million to Manver.  After these
transactions, Manver had been paid the $22.5 million.  The
payments consisted of the $10 million cash that originated from
the Dapy and Roundabout entities, for which the commercial paper
was issued, and $12.5 million in promissory notes.

Amendments were drawn up to the MDT/Manver and MSI/Manver
licensing agreements to reflect the new lump-sum payment terms.
The amendments provided for 10-percent interest on the unpaid
balance, interest only payable monthly, and the entire balance
due in 5 years.  An additional term was added to both amendments
that required MDT and MSI to pay to Manver 15 percent of gross
sales that were in excess of base amounts set forth in the
agreements.  The base amounts were:

| Year | MDT Base | MSI Base |
|------|----------|----------|
| 1988 | $17,800,000 | $11,700,000 |
| 1989 | 20,000,000 | 13,400,000 |
| 1990 | 22,300,000 | 15,200,000 |
| 1991 | 24,500,000 | 17,300,000 |
| 1992 | 24,500,000 | 18,200,000 |

Santandreu decided to refinance the $12.5-million promissory notes with commercial paper to avoid the withholding, as was accomplished on the $10 million. On March 23 and 24, 1988, Manver deposited $9.03 million with Gatetown. On March 24, 1988, the refinancing was accomplished by the following transactions: Gatetown transferred approximately $4.03 million to Lince, which transferred the same amount to Roundabout; Roundabout transferred $2.673 million to Gatetown; Gatetown transferred approximately $7.672 million to MDT, which then transferred this amount to Manver.

Manver started the circle again by transferring $2.672 million to Gatetown, which transferred that sum to Lince. Lince transferred $1.41 million to Primavert, which transferred that sum to Protravol. Lince transferred another $1.262 million to Roundabout. Roundabout then transferred approximately $1.944 million to Protravol. Protravol transferred approximately $3.354 million to Gatetown, which transferred it to MSI, which, in turn, transferred it to Manver.

By shifting the funds, which originated with Manver, through the various entities, MSI and MDT used $7.672 million to reduce

the debts to Manver by $11 million.  MSI issued $3.5 million and MDT issued $8 million in commercial paper to six entities-- Protravol; Attractours; Futureprom; Amsrott, N.V. (Amsrott); Celin, N.V. (Celin); and Slider, N.V. (Slider)--to account for the $11 million paid to Manver, even though none of the six companies provided any of the funds to pay the Manver debt as the funds originated from Manver.

The original $10 million that was transferred to Gatetown from Dapy and Roundabout was returned to Dapy and Roundabout in May and June 1988.  The first tranche of commercial paper that was issued December 22, 1987, was to mature on June 17, 1988.  On that day, $2.391 million was channeled through various entities in order to retire the first tranche of commercial paper totaling $10.5 million.  At the same time, another tranche of commercial paper totaling $10 million was issued.

As each tranche of funds matured, a new set of transactions occurred that retired the old paper, issued new paper, and paid amounts that were associated with the issuance of the paper, such as Original Issue Discount interest and guarantee fees.  The commercial paper carried an interest rate of 1 percent over London Interbank Offered Rate (LIBOR).  The interest and guarantee fees were transferred from the controlled entities receiving the payments to the Spanish investors' Eurotor companies in proportion to the Spanish investors' interests in MTNV and MANV.

Dapy and Roundabout acted as guarantors on the commercial paper transactions and received fees for the service. Although the fees were paid to Dapy and Roundabout, the fees were ultimately distributed to the group of Spanish investors. Neither Dapy nor Roundabout was actually required to make a payment as a guarantor.

Subsequent tranches of commercial paper were issued on dates including September 17, 1988; December 14, 1988; March 15, 1989; June 11, 1989; September 10, 1989; March 6, 1990; August 30, 1990; November 26, 1990; and later. These transfers used the same type of circular funding. The only differences were the dates, bank accounts, amount of money, and which entities were used.

The companies that participated in the commercial paper transactions and the companies that acted as guarantors of the paper were controlled by the Spanish investors. Primarily, Santandreu directed and A. Gelabert and Onate carried out various aspects of the commercial paper transactions. Santandreu owned an interest in a finance company and had been represented by the other Spanish investors to be an expert in international finance.

XII. Royalty Transactions Relied Upon in Federal Tax Returns

The positions taken by the Medieval Times entities on their Federal tax returns with regard to royalty payments were based on the following series of purported transactions: Gatetown's purchase of the Medieval Times concept from TM on March 1, 1986,

for $7,312; Manver's purchase of the Medieval Times concept from Gatetown on May 27, 1986, for $5.6 million; MSI's right under the Manver license to use the Medieval Times concept from Manver for $7 million on December 22, 1987, and the related commercial paper used to finance the transaction; and MDT's right under the Manver license to use the Medieval Times concept from Manver for $15.75 million on December 22, 1987, and the related commercial paper used to finance the transaction.

XIII.  Federal Tax Returns

A.  MTNV/MSI

The MTNV Federal tax returns for fiscal years ended July 30, 1987, and August 1987 (partial year return), and the MSI returns for the fiscal years ended July 31, 1988, and July 31, 1989, were prepared by the C&L Orlando office.  Statements attached to the returns indicated that MTNV transferred its assets to MTBV and that MTBV transferred its assets to MSI, in section 351 transactions for stock and securities.  The statements reported that all future operations would be reported by MSI.  The statements reflected the property received, stock and securities issued, and liabilities assumed:  "Medieval Times B.V. has assumed all of the liabilities of Medieval Times, N.V."

MTNV/MSI reported the following on its Federal tax returns:

| FYE July | Gross Receipts | Total Income | Taxable Income | Royalties/ Franchise Payments |
|---|---|---|---|---|
| 1986 | $ 7,048,767 | $3,836,276 | $ 636,795 | -- |
| 1987 | 8,880,965 | 5,884,314 | 1,308,856 | $ 888,513 |
| 1988 | 11,338,915 | 7,522,728 | 1,485,473 | 489,190 |
| | | | | 855,023 |
| 1989 | 12,714,857 | 8,401,603 | 1,815,541 | 1,400,000 |
| | | | | 15,728 |
| 1990 | 13,413,711 | 8,526,965 | 1,636,788 | 1,400,000 |

12/31 Calendar Year

| | | | | |
|---|---|---|---|---|
| 1990 | 4,290,024 | 2,696,365 | 205,292 | 583,333 |
| 1991 | 11,759,972 | 7,710,400 | 1,754,155 | 1,400,000 |

MSI deducted as consulting fees to Eurotor:

| MSI | 1988 | 1989 |
|---|---|---|
| Eurotor | $232,549 | $86,341 |

Included in the 1987 through 1989 returns were additional deductions for management fees and royalty payments to Manver. The 1988 and 1989 returns also contained deductions for debt guarantees, franchise amortization, and interest including Original Issue Discount.

The taxable income of MTNV/MSI for years ended 1984 through 1991 totaled $9,024,857. The total royalty/franchise payment paid to Manver for that period was $7,031,787. Of the preroyalty payment profits, 56 percent went to MTNV/MS and 44 percent went to Manver as royalty and franchise payments.

In August and September 1985, J. Russell Hamlin (Hamlin) of C&L Orlando sent two letters to Lesley Gelabert (L. Gelabert), A. Gelabert's wife, at Inverspan, regarding Inverspan, MTNV, and

Eurotor.  The letters informed L. Gelabert that the Internal Revenue Service (IRS) had issued new reporting requirements for U.S. corporations and foreign corporations operating in the United States that are owned by a foreign person.  The requirement was that a reporting entity had to report each transaction with a "related party" on IRS Form 5472, Information Return of a Foreign Owned Corporation.  One letter stated that transactions were defined broadly and included commissions, interest, rents and royalties paid and received, loans, sales, purchases, and services performed by or for the reporting entity.  The letter continued:

> Separately, it is expected that the IRS will utilize the information contained on Form 5472 to determine whether the reported transactions were conducted at "arms-length".  Thus, in reviewing transactions for preparation of the Form 5472, the vulnerability to attack by the IRS under the Section 482 arms-length standard should also be considered.

Hamlin sent a final IRS proof copy of Form 5472 with instructions.  Hamlin also offered to assist L. Gelabert in reviewing transactions to determine whether they must be reported and "to further assist in minimizing the exposure to future IRS audit adjustments under Section 482."

No Forms 5472 were filed with the MTNV 1987 Federal return.  Neither MTNV nor MSI filed Forms 5472 with their Federal returns for fiscal years ended 1988 and 1989 for transactions engaged in with Manver, Gatetown, Lince, Futureprom, Attractours, Edemle, Celin, Amsrott, Slider, Protravol, Etano, N.V. (Etano), or

Lebasi, N.V. (Lebasi). Linda Parks (Parks) of C&L Orlando prepared and signed the MSI 1988 return. It was also signed by Sans. At the time she prepared the return, Parks was aware of the Form 5472 requirement but did not know that the franchise fee was being paid to a related party.

B. MANV/MDT

The MANV/MDT Federal tax returns for fiscal years ended November 30, 1987 through 1990, were prepared by the Los Angeles C&L office. Statements attached to the returns indicated that MANV transferred its assets to MABV and that MABV transferred its assets to MDT, in section 351 transactions for stock and securities. The statements included information that MABV had assumed all of the liabilities of MANV.

MANV/MDT reported the following on its Federal tax returns:

| FYE Nov. 30 | Gross Receipts | Total Income | Taxable Income | Royalties/ Franchise Payments |
|---|---|---|---|---|
| 1987 | $14,409,710 | $10,601,670 | $4,347,581 | $1,441,924 |
| 1988 | 18,665,675 | 13,836,206 | 1,183,497 | 3,719,321 |
| 1989 | 21,278,643 | 15,537,012 | 1,054 389 | 5,148,541 |
| 1990 | 31,251,794 | 22,688,216 | 5,563,637 | 2,975,726 |

12/31 Calendar Year:

| | | | | |
|---|---|---|---|---|
| 1990 | 2,367,034 | 1,730,776 | 442,963 | 248,004 |
| 1991 | 34,793,808 | 24,047,269 | 2,817,007 | 4,396,287 |

Additionally, petitioners MANV/MDT claimed deductions for payments it made as management and consulting fees in the amounts of:

| MANV/MDT | 1987 | 1988 | 1989 |
|----------|------|------|------|
| Eurotor | $271,041 | $373,854 | $ 37,546 |
| RC | 132,937 | 380,096 | 228,128 |
| A. Gelabert | 16,580 | 17,215 | 21,877 |
| Santandreu | 37,000 | 21,069 | 8,000 |
| Segui | 44,000 | | |

Included in the 1987 through 1990 returns were additional deductions for royalties/franchise fees and interest expenses. The 1988 and 1990 returns also claimed deductions for guarantee fees.

For fiscal years ended 1986 through 1991, MANV/MDT's taxable income totaled $15,738,227.  During the same period, payments to Manver for franchise/royalties fees totaled $18,336,335.  Of the preroyalty payment profits, 46 percent went to MANV/MDT and 54 percent went to Manver.

No Forms 5472 were filed by MANV/MDT on its 1986 through 1991 income tax returns for transactions with Manver, Gatetown, Lince, Futureprom, Attractours, Edemle, Celin, Amsrott, Slider, Protravol, Etano, or Lebasi.  Forsyth reviewed and signed the Federal returns for 1986 through 1989.  Forsyth believed that Manver and MDT were related, but Onate informed him in August 1987 that Manver and MDT were not related.  On August 11, 1989, Forsyth signed the MDT Federal income tax return for the fiscal year ended November 30, 1988, which was filed without Forms 5472. August 11, 1989, was less than 2 weeks after the November 30, 1988, MDT certified audit report was issued that disclosed that Manver was a related party.

C.  Eurotor

Eurotor's Federal income tax returns for the fiscal years ended July 31, 1986, and July 31, 1987, reported income effectively connected with a trade or business in the United States.  Eurotor's Federal income tax return for the fiscal year ended July 31, 1988, was marked "Final Return" and contained the following statement:

> Eurator S.A. (98-0063013) is not effectively connected with the conduct of a trade or business accordingly, Eurator S.A. is not required to file a U.S. income tax return of a foreign corporation (Form 1120F).

The return did not report any effectively connected income for 1988.

XIV.  Certified Audit

Forsyth and Kim were involved in the C&L audits of the Florida entities.  They provided information to C&L in Florida. Kim sent to C&L in Florida a related-party list in which he indicated that Eurotor, Futureprom, Gatetown, Lince, Primavert, RC, Estaspan, and Manver were not related parties.  Kim also crossed off the Spanish investors' names as owners of their respective Netherlands Antilles corporations.

A C&L employee prepared a workpaper entitled "Related Parties".  The initial determination of related parties included Manver, Gatetown, Futureprom, and Lince.  The employee noted that, after subsequent discussions with the client, it was determined that Manver, Gatetown, Futureprom, and Lince were not related.  C&L was advised in the MDT audit for the fiscal year

ended November 30, 1988, that the commercial paper debt was owed to unrelated parties. The reports for the audits of MSI for the fiscal years ended July 31, 1989 through 1993, did not reflect that Manver, Gatetown, or the commercial paper companies were related to, or an affiliate of, MSI.

XV. IRS Audit

Internal Revenue Agent Gary F. Herold (Herold) worked on the Medieval Times examinations from September 1988 until the summer of 1991. Herold worked with Sans, Parks, Kim, and Melody Blunk on the examinations. Kim had left C&L and was then employed by the Medieval Times companies. IRS international examiner Michael Bruton (Bruton) used information provided to him by the Medieval Times representatives to prepare date schedules and organizational charts. During the examination, Bruton was not given a signed contract between TM and Gatetown dated March 1, 1986, for consideration of $7,312. Santandreu informed Bruton and Herold that Gatetown and Manver were owned by de Oteyza (45 percent), Mayol (45 percent), and Santandreu (10 percent). Santandreu provided a document to the IRS that stated that he did not know the shareholders of several corporations, including Dapy, Promidux, Lince, and Manver, because "these are private companies who are doing services for us."

Between 1982 and 1991, A. Gelabert, Santandreu, and Segui held positions as officers, directors, attorneys in fact, powers of attorney, or trustees in the listed companies as follows:

A. Gelabert--Attractours, Calinvest, Dapy, Holiday, Inverspan, Lince, MTNV, Primavert, Promidux, Roundabout, RC, Spectrust, and Wayout; Santandreu--Amsrott, Attractours, Calinvest, Celin, Etano, Futureprom, Gatetown, Inverspan, Lebosi, Lince, MICV, Manver, MABV, MANV, MTBV, MTNV, Primavert, Protravol, Roundabout, and Slider; Segui--Calinvest, Futureprom, Holiday, Inverspan, Lince, Manver, MTNV, Primavert, and TM.

Formal document requests were made to Kim for the MTNV stock and minute books and Manver's tax returns. Neither Herold nor Bruton received these documents. In an October 8, 1990, letter to Bruton, Forsyth stated:

> You should also note that to the best of our knowledge, Manver N.V. has only one minority shareholder in common with Medieval Times N.V. Therefore, Medieval Times, N.V. is not in a position to compel Manver N.V. to produce the requested tax returns. * * *

On June 2, 1992, Greg Cox, an international examiner with the IRS, sent to MDT a notice stating that MDT had been assessed a penalty for not filing certain Forms 5472 as required by section 6038A(b). The notice also stated that further penalties would be assessed if the forms were not submitted for transactions between MDT and MABV, Calinvest, RC, Eurotor, Manver, and Gatetown. Kim submitted the forms on behalf of MDT. Some of the forms had disclaimers attached that stated:

> It is our opinion that Medieval Dinner & Tournament, Inc. and * * * do not meet any of the definitions defining the boxes in Part II, 3. By filing the attached Form 5472, Information Return of a Foreign Owned Corporation, pursuant to Section 6038A,

Medieval Dinner & Tournament, Inc. is not admitting
that * * * was a "related party" of Medieval Dinner &
Tournament, Inc. during the period * * * under Sections
6038, 6038A or any applicable Section, law or code; and
Medieval Dinner & Tournament, Inc. is not admitting
that there exist any "reportable transactions" between
Medieval Dinner & Tournament, Inc. and * * * for the
period * * * under Sections 6038, 6038A or any
applicable Section, law or code.

There were disclaimers for transactions with RC, Eurotor, Manver,
and Gatetown.

OPINION

With the exception of the additions to tax and penalties for
fraud, petitioners have the burden of proving that respondent's
determinations as made in the notice of deficiency are erroneous.
Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84
(1992); Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir.
1975), affg. T.C. Memo. 1972-133.

I.  Management and Consulting Fees

Petitioners MANV/MDT and MSI claimed deductions for payments
made for management and consulting fees in the following amounts:

| MANV/MDT | 1987 | 1988 | 1989 |
|---|---|---|---|
| Eurotor | $271,041 | $373,854 | $ 37,546 |
| RC | 132,937 | 380,096 | 228,128 |
| A. Gelabert | 16,580 | 17,215 | 21,877 |
| Santandreu | 37,000 | 21,069 | 8,000 |
| Segui | 44,000 | | |

| MSI | 1988 | 1989 |
|---|---|---|
| Eurotor | $232,549 | $86,341 |

With the exception of a portion of MANV/MDT's 1987, 1988, and
1989 payments to Eurotor, respondent determined that the above

amounts are not deductible under section 162(a) because the payments represented a distribution of profits.

Section 162(a) allows deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Management expenses are among the items included in business expenses.  Sec. 1.162-1, Income Tax Regs.  The test of deductibility of payments made for services, whether compensation or management, is whether the payments are reasonable and are in fact payments purely for services.  Achiro v. Commissioner, 77 T.C. 881, 903 (1981); sec. 1.162-7(a), Income Tax Regs.  A bona fide contract for management services may be a factor in establishing deductibility.  Achiro v. Commissioner, supra.  Whether an expense that is claimed pursuant to section 162(a) is compensation for services rather than a distribution of profits is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).  If the corporation is closely held and the persons receiving the payments are shareholders, the payments are subject to close scrutiny to determine whether the alleged compensation is in fact a distribution of profits.  Elliots, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282.  Management fees paid to related parties in excess of reasonable arm's-length fees

are not deductible.  Latham Park Manor, Inc. v. Commissioner, 69
T.C. 199, 218 (1977), affd. without published opinion 618 F.2d
100 (4th Cir. 1980).

The cases contain a lengthy list of factors that are
relevant in the determination of reasonableness of compensation,
including:  The employee's qualifications; the nature, extent,
and scope of the employee's work; the size and complexities of
the business; a comparison of salaries paid with gross income and
net income; the prevailing general economic conditions; a
comparison of salaries with distributions to stockholders; the
prevailing rates of compensation for comparable positions in
comparable concerns; the salary policy of the taxpayer as to all
employees; and the amount of compensation paid to the particular
employee in previous years.  Mayson Manufacturing Co. v.
Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a
Memorandum Opinion of this Court dated Nov. 16, 1948.

Petitioners applied to the facts in the instant cases the
factors listed in Mayson Manufacturing Co. and conclude in their
brief that "it is clear that the management and consulting fees
at issue were ordinary, necessary, reasonable and consistent with
an arm's-length charge."  The facts on which petitioners base
their conclusion include Eurotor's oversight of the Medieval
Times operations, RC's catering and ranch operations, and Segui's
and Santandreu's positions as members of various boards of

directors and their assistance with the New Jersey and California expansions.

Respondent's primary arguments to support her determination that the fees paid as management and consulting fees were disguised dividends are: (1) Petitioners failed to establish that services were provided as required by section 162(a); (2) payments were made in proportion to stockholdings; and (3) it is unclear in what capacity RC, A. Gelabert, Santandreu, and Segui were performing various tasks.

A. Eurotor

1. Services

The preponderance of evidence is that substantial services were provided to petitioners by various persons who also were directly or indirectly owners of petitioners. The Eurotor shareholders were successful businessmen who possessed a myriad of skills from management to financing. The Eurotor shareholders' ability to select key management employees, suitable locations, and apply their knowledge of the tourist and restaurant industries were services that were valuable. The shareholders' experience with an existing enterprise in Spain on which this venture was modeled added to the value of the services. Santandreu and Segui spent considerable time in the United States, assisting with operations and providing management services. Unlike dividends, the payment of management fees was not dependent on earnings and profits. The Eurotor shareholders

provided services, and, whether the business was profitable or not, they were entitled to reasonable compensation for their services.  See Achiro v. Commissioner, supra.

We believe the January 24, 1983, Eurotor contract with MTNV was bona fide.  Although not in effect during the years in issue, it corroborates petitioners' assertions.  See Paula Constr. Co. v. Commissioner, supra.  Allen testified that he drafted the document in 1983.  A list of documents that was kept at MTNV's offices in 1983 included the January 24, 1983, contract.  (The contract did not mention a franchise or refer to any other contracts or agreements.)  The contract embodied Santandreu's promise to the Eurotor shareholders that they would be compensated for bringing the Medieval theme show to the United States.  The management contract that was in effect during the years in issue was substantially a renegotiation of the January 24, 1983, contract.

2.  Compensation in Proportion to Stockholdings

Respondent argues that a distribution of management fees in proportion to stockholdings is indicative of disguised dividends. "As the regulations explain, however, even payments made to shareholders in proportion to their ownership are, as a general rule, improper only if they are in excess of what is usually paid for similar services." Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affg. T.C. Memo. 1985-267; sec. 1.162-7(b), Income Tax Regs.

We are guided by prior cases in reviewing the evidence here. If payments in dispute are contingent compensation pursuant to a contract, the circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract was questioned.  American Foundry v. Commissioner, 59 T.C. 231, 244 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976); sec. 1.162-7(b)(3), Income Tax Regs.  The past and present financial condition of the company is relevant.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). Evaluating the compensation as a percentage of net income, rather than of gross receipts, is in most cases more probative because it more accurately gauges whether a corporation is disguising the distribution of dividends as compensation.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1325-1326.

The Eurotor/MTNV January 24, 1983, contract for management services established a fee of 50 cents per patron.  The attendance figures and profitability of the company were unknown at the time of the contract because the Kissimmee castle did not open until December 1983.  The MSI contract, which was in effect during the years in issue, was essentially a renegotiation of the January 24, 1983, contract.  The MSI contract changed the fee from 50 cents per client to a fee of 2 percent of gross production.  Based on MSI's 1988 and 1989 tax years, during which gross production was $11,338,915 and $12,714,857, respectively,

the renegotiation resulted in additional fees of approximately $20,000 per year.

The Eurotor MANV/MDT management contract also had a fee of 2 percent of gross production. Notwithstanding that the contract was probably not ratified until 1987, the castle opened in 1986 and the operation's profitability was untested at the time the fee was determined.

In Good Chevrolet v. Commissioner, T.C. Memo. 1977-291, this Court addressed the reasonableness of compensation paid to two employees of an automobile dealership. The two employees held 100 percent of the corporation's stock. The issue was whether bonuses that constituted predetermined percentages of profits were reasonable. The facts that tended to support a finding of excess compensation included: The two shareholders controlled the corporation's finances; the amount of net income paid out as bonuses during the years in issue approximated 60 percent per year; and the success of the business was due in part to fortuitous economic conditions and not to altered or augmented endeavors by them. The facts that tended to support the reasonableness of the compensation included: The business was extraordinarily successful, due in part to programs instituted by the shareholders; the shareholders were astute, aggressive businessmen; and, although a percentage of the profits was determined before one shareholder had a controlling interest in

the corporation, that shareholder did not change the percentage once he obtained control.

In reaching our conclusion, we considered that, "Though the officers were also shareholders of the petitioner, they are entitled to reasonable compensation for services actually rendered." Good Chevrolet v. Commissioner, supra (citing Commercial Iron Works v. Commissioner, 166 F.2d 221, 224 (5th Cir. 1948)). Contingent compensation paid pursuant to a free bargain between the parties before services are rendered should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount that would ordinarily be paid. Sec. 1.162-7(b)(3), Income Tax Regs. The arrangement also may result in lesser compensation in less successful years. Finally, we noted "this is not a case in which the controlling officers annually draw all, or virtually all, of the profits of the business in the form of bonuses." Good Chevrolet v. Commissioner, supra; cf. Boyle Fuel Co. v. Commissioner, 53 T.C. 162, 171 (1969); see Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987) (the contracts did not create a situation where virtually all of the taxable income was paid out as compensation). We concluded that compensation paid to shareholder-employees constituting approximately 60 percent of net income was reasonable. Good Chevrolet v. Commissioner, supra.

Here, as in <u>Good Chevrolet</u>, the Eurotor shareholders controlled the entity paying the management fees. However, the compensation that was paid to Eurotor as management fees under both the MSI and MANV/MDT contracts, expressed as a percentage of net income, was substantially below 60 percent:

|      | <u>1987</u> | <u>1988</u> | <u>1989</u> |
|------|-------------|-------------|-------------|
| MSI  | --          | 15.0%       | 4.7%        |
| MANV | 6.2%        | --          | --          |
| MDT  | --          | 31.5%       | 3.5%        |

The Medieval Times companies successfully tapped into the tourist markets in Florida and California, and the success was due in part to the Eurotor shareholders' selection of locations and employees. The California management contract that established a 2-percent-of-gross-production fee was effective before the profitability of the business was known and was not modified after the business became profitable.

The facts support the conclusion that the amounts paid to the Eurotor shareholders were not in excess of compensation that would be paid for similar services. Therefore, that the payments were made in proportion to stockholdings does not make the payments improper. <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1324; sec. 1.162-7(b), Income Tax Regs.

We are persuaded that the MSI and MANV/MDT payments made to Eurotor as management and consulting fees during the years in issue were reasonable and for services as required by section 162; therefore, the deductions will be allowed.

B.  <u>Royal Catering</u>

A. Gelabert was the 100-percent owner of RC.  RC was a 5-percent owner in MANV/MDT.  RC's 1987 management agreement with MDT, which called for RC to receive 5 percent of MDT's gross profits, was the vehicle through which A. Gelabert was to receive his 5-percent ownership interest in MDT.

It is undisputed that A. Gelabert provided valuable services to the Medieval Times operation.  Petitioners state on brief that A. Gelabert "was compensated primarily through the management fees paid to Royal Catering, which he owned."  Pursuant to the RC/MDT management agreement, MDT was to reimburse RC for amounts RC paid as wages to RC employees, specifically A. Gelabert.  The management agreement provided for RC to receive fees under the contract for "services" and also to receive amounts as reimbursement for wages paid.  Therefore, the nonreimbursed amounts were not wages.  Petitioners have failed to substantiate which, if any, amounts paid to RC were reimbursable wages.  We conclude that the services that A. Gelabert provided to MDT, through the RC/MDT management agreement, were to protect or enhance A. Gelabert's investment in MDT.  See <u>Olton Feed Yard, Inc. v. United States</u>, 592 F.2d 272 (5th Cir. 1979).

RC had been used as a vehicle by petitioners on several previous occasions.  MTNV loaned to RC $100,000 and then paid the interest on the loan.  RC was used to obtain visas for A. Gelabert and Sans.  RC did not have its own books and records;

its ledgers were part of MANV/MDT's ledgers during the years in issue. Petitioner MANV/MDT has not persuaded us that the payments to RC were business expenses and not dividend payments to A. Gelabert. Because the payments to RC were not ordinary and necessary business expenses, as required under section 162, they were not deductible. Accordingly, respondent's determination on this issue will be sustained.

### C. A. Gelabert, Santandreu, and Segui

Petitioners argue that Santandreu and Segui were entitled to compensation because they were directors of MANV and worked on the expansion of the Medieval Times companies and that A. Gelabert was entitled to compensation because of the services he provided to MANV.

Respondent contends that petitioners have a "hat problem" with regard to the payments to A. Gelabert, Santandreu, and Segui because it is unclear why MDT made the payments.

We agree with respondent that petitioners have a "hat problem". Between 1982 and 1991, A. Gelabert, Santandreu, and Segui held positions as officers, directors, attorneys in fact, powers of attorney, or trustees in the listed companies as follows: A. Gelabert--Attractours, Calinvest, Dapy, Holiday, Inverspan, Lince, MTNV, Primavert, Promidux, Roundabout, RC, Spectrust, and Wayout; Santandreu--Amsrott, Attractours, Calinvest, Celin, Etano, Futureprom, Gatetown, Inverspan, Lince, MICV, Manver, MABV, MANV, MTBV, MTNV, Primavert, Protravol,

Roundabout, and Slider; and Segui--Calinvest, Futureprom, Holiday, Inverspan, Lince, Manver, MTNV, Primavert, and TM. The individuals were working in several different capacities concurrently, and it is unclear in which capacity they were working at any particular time. Additionally, the individuals were also shareholders in many entities. Santandreu and Segui were shareholders in MANV and Eurotor. A. Gelabert was a shareholder in MANV. If they were acting in their capacity as shareholders, the services they provided to protect their interests as shareholders are not deductible under section 162. Olton Feed Yard, Inc. v. United States, supra. We conclude that the amounts paid to A. Gelabert were wages, and the amounts paid to Santandreu and Segui were dividends for the following reasons.

A. Gelabert was hired to run the castle. He was in charge of renovating the castle and getting the operation off the ground. He was entitled to payment for his services as an employee of MANV. The amounts paid to A. Gelabert were not dividends because, as we have previously concluded, he was receiving his dividends through RC.

Eurotor was entitled to receive compensation for the management services it provided to petitioners. In order to provide those services, it had to have representatives working with petitioners. Santandreu and Segui spent considerable time in the United States assisting with operations and providing management services. We conclude that Santandreu and Segui were

working in their capacity as Eurotor representatives; they were not entitled to additional compensation from petitioners. The additional payments they received were dividends. Therefore, the amounts paid to Santandreu and Segui individually were dividends for their interests as shareholders in MANV.

## II. Franchise Transactions and Royalty Fees

Petitioners deducted the franchise and royalty expenses on their Federal tax returns as "ordinary and necessary" business expenses under section 162(a). Petitioners have elected to apply the 1994 Intercompany Transfer Pricing Regulations (secs. 1.482-1 to 1.482-8, Income Tax Regs.) to each of the taxable years in issue as permitted under sec. 1.482-1(j)(2), Income Tax Regs. Petitioners argue that the deductions satisfy the section 482 regulations on valuation and that no allocation is justified. They argue on brief that the "pivotal issue here is the value of the intellectual property that was transferred to the petitioners, not the nature of the transactions by which they preserved their rights to use it." Petitioners maintain that the extraordinary profitability of the Medieval Times companies confirms the economic substance of their arrangement with Manver.

Petitioners presented expert testimony and information on alleged comparables to support the argument that the income that petitioners attributed to the intangible was justified. The thrust of petitioners' position is that they could pay unlimited royalties so long as they received an adequate rate of return;

and the reported and taxed income was an adequate rate of return by comparison to various industry standards. Respondent argues and, for reasons appearing below, we agree that we need not belabor or even discuss this evidence.

Respondent determined that the amounts that petitioners deducted under section 162(a) as franchise and royalty payments to Manver were not "ordinary and necessary" business expenses under section 162(a). Respondent's main contention is that the transactions that were the basis for the deductions were not bona fide arm's-length transactions at fair market value and that the transactions had no economic purpose or substance. Respondent further determined that the amounts deducted represented income to nonresident alien individuals/foreign corporations and that distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes and to reflect income clearly as authorized under section 482.

On brief, respondent agrees with petitioners that conceptually section 482 would apply because of petitioners' common control, the shifting of income and deductions, and the need to reflect income clearly. Respondent contends, however, that there is no need to resort to allocations under section 482 because the Medieval Times companies owned the intangibles that they were purporting to license and there was no economic substance to the transactions.

Section 482 permits respondent to make adjustments to petitioners' Federal tax returns:

SEC. 482.   ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly reflect the income of any such organizations, trades, or businesses.

In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Section 936(h)(3)(B) defines intangible property:

(B) Intangible property.--The term "intangible property" means any--

(i) patent, invention, formula, process, design, pattern or knowhow;

(ii) copyright, literary, musical, or artistic composition;

(iii) trademark, trade name, or brand name;

(iv) franchise, license, or contract;

(v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or

(vi) any similar item,

which has substantial value independent of
the services of any individual.

Section 1.482-1(i)(5), Income Tax Regs., defines a
controlled taxpayer as follows:

(5) Controlled taxpayer means any one of two or
more taxpayers owned or controlled directly or
indirectly by the same interests, and includes the
taxpayer that owns or controls the other taxpayers.
* * *

In determining the true taxable income of a controlled
taxpayer, the standard to be applied in every case is that of a
taxpayer dealing at arm's length with an uncontrolled taxpayer.
Sec. 1.482-1(b), Income Tax Regs.  The "arm's-length" test
commonly associated with section 482 is equally applicable in
ascertaining the "ordinary and necessary" character of a payment
to a related party that is deducted under section 162(a).  R.T.
French Co. v. Commissioner, 60 T.C. 836, 849 (1973).  A
controlled transaction meets the arm's-length standard if the
results of the transaction are consistent with the results that
would have been realized if uncontrolled taxpayers had engaged in
the same transaction under the same circumstances (arm's-length
result).  Sec. 1.482-1(b), Income Tax Regs.

Petitioners argue that the "White Paper", "A Study of
Intercompany Pricing Under Section 482 of the Code," I.R.S.
Notice 88-123, 1988-2 C.B. 458, referred to legislative rejection
of R.T. French Co.  The White Paper addressed only the view that
a long-term fixed rate royalty agreement could not be adjusted
under section 482 based on actual events.  Notice 88-123, 1988-2

C.B. at 477. This Court has long recognized the use of an "arm's-length" standard to determine the ordinary and necessary character of a payment to a related party under section 162(a) (and its predecessor, section 23(a)). <u>Differential Steel Car Co. v. Commissioner</u>, 16 T.C. 413, 423-425 (1951); <u>Granberg Equip., Inc. v. Commissioner</u>, 11 T.C. 704, 713-714 (1948); <u>Nestle Co. v. Commissioner</u>, T.C. Memo. 1963-14.

Section 482 sets forth two requirements with respect to intangibles:  (1) A transfer or license of the intangible and (2) the income received because of the transfer must be commensurate with the income attributable to the intangible. Petitioners assert that there was a transfer of intangibles, i.e., the Medieval Times concept from TM to Gatetown and from Gatetown to Manver.  Petitioners further assert that, once Manver owned the intangibles, MSI and MDT were obligated to enter into licensing agreements with Manver in order to use the Medieval Times concept.  Petitioners' primary arguments begin at this point and focus on whether the amounts paid under the licensing agreements are commensurate with the income attributable to the intangibles.  Petitioners rely on the section 482 regulations, which provide several different methods to determine whether a transaction is at arm's length.  The methods address the "income attributable to the intangible" language of section 482.

Before we can ascertain if the income with respect to a transfer is commensurate with the income attributable to the

intangible, however, we must first identify a transfer of the intangible as required by section 482. Petitioners' discussion of whether or not a transfer of the intangible occurred is cursory at best.

The essence of a transfer, as respects taxation, is the passage of control over the economic benefits of property rather than any technical changes in its title. Estate of Sanford v. Commissioner, 308 U.S. 39, 43 (1939); Burnet v. Guggenheim, 288 U.S. 280, 287 (1933). The word "transfer", as used in the tax law, has its ordinary significance and means the handing over or parting with property with intent to pass it, or certain rights in it, to another, who becomes the transferee. In re Gould's Estate, 156 N.Y. 423, 51 N.E. 287, 288 (1898).

Inherent in the definition of transfer is the concept that the transferor must control or own the rights or economic benefits that the transferor desires to transfer to the transferee. To establish that a transfer has occurred, we must identify who owns the rights and economic benefits of the property that is the subject of the transfer. Section 1.482-4(f)(3)(ii)(B), Income Tax Regs., defines ownership as follows:

> (B) Intangible property that is not legally protected. In the case of intangible property that is not legally protected, the developer of the intangible will be considered the owner. * * *. Ordinarily, the developer is the controlled taxpayer that bore the largest portion of the direct and indirect costs of developing the intangible, including the provision, without adequate compensation, of property or services likely to contribute substantially to developing the intangible. A controlled taxpayer will be presumed not

to have borne the costs of development if, pursuant to an agreement entered into before the success of the project is known, another person is obligated to reimburse the controlled taxpayer for its costs.  * * *

Intangible assets that are legally protected include patents, trademarks, and copyrights.  The Medieval Times intangibles were not legally protected until the trademarks were registered in California and Florida in 1987 and registered with the U.S. Patent and Trademark Office in 1988.

We must ascertain who bore the largest portion of the development costs of the Medieval Times "formula".  Petitioners argue that the formula was the intangible transferred for arm's-length value.  The facts overwhelmingly support the conclusion that MTNV, from 1983 through 1986, developed the Medieval Times formula.  A. Gelabert was hired and paid by MTNV to run the Florida operation.  MTNV paid the salaries of the employees who were responsible for developing the Medieval Times concept, including:  Stonecrow, who designed and produced the costumes for the show; Bellows and Kudlacz, who developed the marketing plans; and Galindo, who established the photography lab and pioneered the use of group photographs.

The construction costs for the Florida castle were paid by Inverspan.  Inverspan received the funds from a loan guaranteed by the Spanish investors who were also the MTNV and Inverspan shareholders.  The costs to modify the facility from 1983 through 1986 to reflect the ongoing development of MTNV were paid by MTNV.  Those modifications included work on the kitchen, the

stables, the entry to the castle, and the addition of a medieval village.  Additionally, MTNV had a contract to pay Eurotor for management and consulting services.

The "Medieval Times" name was first used in the United States in December 1982 when Castro filed an application for a post office box in Kissimmee.  From 1982 until the purported licensing agreements with Manver, MTNV conducted business using the "Medieval Times" name and the "formula" without paying compensation to any other person or entity.  Petitioners argue that the agreements between MTNV and TM dated February 1, 1983, bound MTNV to compensate TM for the use of the intangibles.

The language in the two contracts between MTNV, Eurotor, and TM, dated February 1, 1983, and January 20, 1983, is virtually identical to the language in Forsyth's November 1986 draft letter to Santandreu.  Forsyth's letter was a recap of a conversation between Forsyth and Santandreu.  In the letter, Forsyth discussed the franchise agreement, the script document, and the need to set out TM's responsibilities as licensor of the Medieval Times concept.  The letter stated that TM should include with its duties assistance with the design of costumes, with training horses and actors, and with quality control.

On cross-examination, Forsyth was asked about his notes taken on or about May 20, 1986.  His testimony proceeded as follows:

Q  Okay.  Did you understand at the time you made these notes that there was an agreement to transfer those intangibles?

A  I don't know whether there was an agreement to transfer the intangibles at that time.

Q  Okay.  Well, you indicated that if you had an agreement you could prepare a document later and have it signed effective as of the date of the agreement, correct?

A  Correct.

Q  Okay.  Do you have a recollection at this point, the effective date of this transfer of intangibles?

A  No, I don't know the effective date of the transfer.

Q  Okay.  So if the effective date of the transfer was prior to the time that you took these notes, then would that indicate to you that you were advised that there was an agreement in effect?

A  An agreement for which?

Q  For the transfer of the intangibles?

A  I can't comment.  I   that was not my understanding.

Q  It was not your understanding that there was an agreement in effect at the time you made these notes?

A  I'm not aware that there was   aware that there was an agreement to transfer the intangibles at that time.

Q  Okay.  Were you not aware, one way or the other?

A  One way or the other.  I would   my assumption at the time and now is that I was not aware of any agreement to transfer.

Forsyth discussed a possible management contract, in

addition to the franchise agreement, and stated that the

management agreement must emphasize that the services provided in the management agreement extend beyond the normal stewardship functions that the shareholders may exercise. The management services that Forsyth suggested included providing detailed advice on accounting and administration, financing, and personnel selection. Forsyth recommended a fee of 10 to 15 percent for the franchise agreement and 2 percent for the management agreement.

C&L received unsigned copies of agreements dated January 20, 1983, and February 1, 1983, for the first time on December 12, 1986, a month after Santandreu received Forsyth's letter. The January 20, 1983, document stated that TM was to take "exclusive charge of technical assistance, not management," and to contribute the use of the name, trademark, handbook, or formula; experience with respect to choreography, lights, sound, and the making and maintaining of costumes and wardrobes; and quality control. TM was to receive as compensation 10 percent of MTNV's gross production.

The February 1, 1983, agreement stated that Eurotor was to contribute experience in the management of companies, including finance, administration, and personnel. The other documents received by C&L on December 12, 1986, included management agreements between Eurotor and MANV and Eurotor and MTNV dated February 1, 1986, and August 1, 1986, respectively. These agreements also contained language identical to Forsyth's

November 1986 letter and provided for MANV and MTNV to each pay Eurotor 2 percent of their gross production.

It is not credible that the similarity in language and fees in the 1983 agreements and the 1986 letter were purely coincidental. This is particularly so because the similar language, and the concept of franchising, are absent from the January 24, 1983, management contract between Eurotor and MTNV. Additionally, the agreements provided for licensing the use of the trademarks, and there were no registered trademarks in 1983. The January 24, 1983, contract was the only document that was signed, and Allen testified that he drafted the document in 1983. The alleged draftsman of the other documents was Jose Luis Fernandez (Fernandez) an "economist and tax adviser" who was only beginning his professional business in 1982 and 1983. Fernandez was a relative of Segui, and Fernandez testified that Segui came to him instead of a lawyer because "it was easier for him to direct me." Fernandez testified that he used the word "franchising" in the contracts because Segui directed him to use that specific word. However, Kim testified that, prior to 1986, the Medieval Times organization was not called a franchise. Hokanson at LL did not form an opinion that the Medieval Times transactions fell within the California Franchise Law until 1986, at which time he advised A. Gelabert of that opinion. Fernandez's testimony as to the dates of his drafts was not credible. We conclude that the January 20, 1983, and February 1,

1983, documents are a belated attempt by petitioners to manipulate or manufacture the facts to fit the form suggested by C&L.

Putting aside the unreliable documentation, we must consider the substance of the relationship. The MTNV shareholders brought an idea from Spain to the United States. It was not a proprietary concept. At the same time that MTNV was opening, another group of investors could have opened a dinner theater with a medieval theme without infringing on the rights of TM. The existence of similar shows, such as King Henry's Feast and King Arthur's Tournament, is evidence undermining petitioners' claims that the medieval dinner theater idea was uniquely valuable. The name "Medieval Times" did not exist prior to MTNV's use of it in 1982. If another group had trademarked the name before MTNV started to use it, TM would have had no recourse because TM did not own the name.

TM did not have any recourse against MTNV for the use of the name "Medieval Times" or for the use of the idea to open a medieval theme dinner theater. Therefore, MTNV had no reason to compensate TM. If TM and MTNV had not been related, MTNV would not have agreed to compensate TM for the use of an intangible that was not yet developed and that TM did not own. Additionally, because TM did not own the intangibles, TM would not have been able to transfer the rights to the intangibles.

Other facts indicate that TM did not own the intangibles. In the purported sale of the intangibles from TM to Gatetown, Gatetown acquired the intangible rights of TM for $7,312 on March 1, 1986 (the document is dated approximately 1 year earlier than it was drafted).  For the fiscal year ended July 31, 1986, MTNV's gross receipts were $7,048,767, and its taxable income was $636,795.  Petitioners acknowledge the nominal consideration and explain on brief that, "since 80 percent of the Eurotor shareholders also held Torneo stock, the only Torneo shareholders who were being bought out were Mr. Rousselet and Mr. Celedonio" (Celedonio).

Petitioners allege that Rousselet was compensated because he was given two other companies to operate and that Celedonio was compensated by a 10-percent profits interest and manager position in TM.  Other than Santandreu's testimony, there is no evidence in the record to corroborate the allegations of compensation for Rousselet and Celedonio.  Additionally, Celedonio was not an original shareholder of TM, and we do not know when or if he became a shareholder.  When asked why TM sold the formula to Gatetown for $7,312, J. Montaner testified:  "Well, my nephew told me this was right, because in practice the people who are selling it were actually also the people who were buying it."  Petitioners state on brief:  "it is undisputed that the Torneo-Gatetown-Manver transactions were between largely related parties and that the non-continuing Torneo shareholders were separately

compensated for their interests. Thus, neither price is reliable evidence of the value of the intangibles."

Petitioners' declaration that the price was an unreliable measure of the value of the intangibles because the parties were related undermines their position. Every transaction that occurred between TM, Gatetown, Manver, MTNV/MSI, MANV/MDT, etc., involved related parties because all or substantially all of the shareholders in the companies were the same. Extending petitioners' analysis, the price in all of the transactions between the parties would be unreliable. We believe that the subsequent sale of the intangibles from Gatetown to Manver for $5.6 million not more than 3 months after Gatetown purchased the intangibles for $7,312 is evidence of the unreliability of the transaction price and evidence that the transactions were not at arm's length.

The subsequent transactions that affected the years in issue are based on these original transactions. The attempt to create a chain of possession of the intangibles from TM to Gatetown to Manver is implausible for several reasons. The foremost reason is that MTNV, and not TM, owned the intangibles. Additionally, the documents were backdated, many of them were unsigned, and there were numerous versions of documents purporting to represent the same transactions. The documents that were received by C&L on December 12, 1986, contained an agreement dated May 26, 1986, where TM purportedly sold the rights to the intangibles to Manver

for approximately $8,700.  Except for the price and the parties, this document was virtually identical to the agreement dated May 1, 1986, where TM purportedly sold the rights to the intangibles to Gatetown.

In some instances, the corporate parties to an alleged agreement were not in existence on the date of the document.  An example is a document dated February 26, 1986, whereby Lince loaned money to Gatetown, and Gatetown agreed to pay Lince 95 percent of Gatetown's income.  Lince was not incorporated until May 16, 1986.  Petitioners attempt to justify backdating as a common practice to memorialize agreements.  In these cases, however, the pattern of backdating was so pervasive as to cast doubt on the reliability of petitioners' representations as to what was agreed, when, and by whom.  The only intent that is clear is the intent to conform to C&L's proposals to minimize or avoid tax liability.

When the intangibles became legally protected by the registration of the trademarks in 1987 and 1988, there was no consideration paid to MTNV/MSI.  C&L and the Spanish investors were undecided as to whether Manver or Gatetown should hold the trademarks in their name.  The decision to hold the trademarks in Manver's name was not made until December 1986, when C&L received a favorable tax ruling from the Netherlands Antilles.  The licensing agreements between Manver and MSI and Manver and MDT were dated May and July 1986, several months before the final

decision to use Manver was made. Additionally, the language in the licensing agreements was almost verbatim language from a draft licensing agreement that Hokanson at LL provided to the Spanish investors on November 11, 1986.

The chronology shows that the trademarks could have been registered in the name of any of the entities controlled by the Spanish investors. The decision was driven by tax considerations and had no relation to who actually developed the intangibles. The choice of which corporate entity to use occurred, and the chain of possession, and the subsequent licensing agreements were created after the favorable tax ruling and attempted to alter the facts to fit the tax planning.

"The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along." Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). Courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes when the objective realities are to the contrary. Commissioner v. Tower, 327 U.S. 280, 291 (1946); Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). If MTNV and Manver had not been related, MTNV would not have allowed the intangibles to be registered in Manver's name without compensation to MTNV. Neither MTNV/MSI nor MANV/MDT had a business reason to pay Manver for intangible rights that Manver did not own.

We are satisfied that the development of the intangibles was paid for by MTNV and that MTNV was the owner of the intangibles as defined in section 1.482-4(f)(3)(ii)(B), Income Tax Regs.  To that extent, we agree with respondent that the structure supporting the payment of royalties or franchise fees was a sham. There was no "arm's-length" reason for MTNV/MSI or MANV/MDT to compensate Manver for the use of intangibles that Manver did not create, develop, or, in substance, have the ability to transfer. Accordingly, the expenses were not "ordinary and necessary" business expenses deductible under section 162(a).  R.T. French Co. v. Commissioner, 60 T.C. 836, 849 (1973).  Respondent's determinations with respect to the franchise and royalty payments to Manver will be sustained.

III.  Interest Expense and Guarantee Fees Resulting From Lump-Sum Franchise Payments

Petitioners deducted amounts as interest and guarantee fees in connection with the promissory notes and the lump-sum royalty payments to Manver.  Petitioners argue that there were business reasons for the financing arrangements, that the debt was bona fide, and that the "economic substance sought by the parties was accomplished."  Petitioners support their argument by pointing out that the 12.5- to 15-percent royalty rates made it difficult for petitioners to finance their planned expansion and that the financing allowed them to control the royalty payments during the expansion period.  Petitioners further attempt to support their argument that there was economic substance to the transactions on

the basis that "Manver gave up the right to substantial pay-as-you-go royalties for several years and instead received cash and promissory notes."

With respect to the guarantee fees, petitioners argue that, because the guarantee fees paid on the commercial paper "did not exceed the amounts that would be charged by an unrelated party, those fees were reasonable for purposes of section 162(a) and consistent with arm's-length amounts for purposes of section 482."

Respondent contends that there was no genuine indebtedness underlying the interest payment, as required by section 163, and, therefore, the transactions were shams. Respondent asserts that the transactions lacked economic substance and were entered into solely for tax-avoidance purposes. Respondent further contends that there was no economic substance to the guarantee fees because there was no bona fide debt to guarantee and because the guarantor controlled the ability of petitioners to repay the debt and the ability of the creditor to enforce the debt and the guarantee.

For interest to be deductible under section 163(a), it must be paid on genuine indebtedness, i.e., an indebtedness in substance and not merely in form. Knetsch v. United States, 364 U.S. 361, 366 (1960). Transactions that lack economic substance and are conducted for the sole purpose of reducing tax liability are disregarded as shams by the courts. Knetsch v. United

States, supra; Saviano v. Commissioner, supra; Falsetti v.

Commissioner, supra.  In Frank Lyon Co. v. United States, 435

U.S. 561, 573 (1978), the Supreme Court stated:

> In applying this doctrine of substance over form, the
> Court has looked to the objective economic realities of
> a transaction rather than to the particular form the
> parties employed.  The Court has never regarded "the
> simple expedient of drawing up papers," Commissioner v.
> Tower, 327 U.S. 280, 291 (1946), as controlling for tax
> purposes when the objective economic realities are to
> the contrary.  "In the field of taxation,
> administrators of the laws and the courts are concerned
> with substance and realities, and formal written
> documents are not rigidly binding."  Helvering v.
> Lazarus & Co., 308 U.S. [252] at 255 [(1939)].  See
> also Commissioner v. P.G. Lake, Inc. 356 U.S. 260, 266-
> 267 (1958); Commissioner v. Court Holding Co., 324 U.S.
> 331, 334 (1945).  Nor is the parties' desire to achieve
> a particular tax result necessarily relevant.
> Commissioner v. Duberstein, 363 U.S. 278, 286 (1960).

The Supreme Court, in concluding that the transactions there in

issue were to be recognized for tax purposes, held that, where:

> there is a genuine multiple-party transaction with
> economic substance which is compelled or encouraged by
> business or regulatory realities, is imbued with tax-
> independent considerations, and is not shaped solely by
> tax-avoidance features that have meaningless labels
> attached, the Government should honor the allocation of
> rights and duties effectuated by the parties.  * * *
> [Id. at 583-584.]

This Court has articulated a definition of "'sham in substance'

as the expedient of drawing up papers to characterize

transactions contrary to objective economic realities and which

have no economic significance beyond expected tax benefits."

Falsetti v. Commissioner, supra at 347; see Rice's Toyota World,

Inc. v. Commissioner, 752 F.2d 89, 91-92 (4th Cir. 1985), affg.

in part and revg. in part 81 T.C. 184 (1983).  In Falsetti, we

considered the totality of the facts and circumstances and determined that the purported purchase of certain real property was a sham because of the absence of transfer of legal title or other indicia of arm's-length dealing, drastically inflated sales prices, and complete disregard of contractual terms.

In these cases, we have considered the entire record and conclude that the financing arrangements for the royalty payments to Manver lacked economic substance and were shams, entered into solely for tax-avoidance purposes.  This conclusion is based on many factors, including the lack of arm's-length dealing, circular money movements, and other questionable business practices.

A close examination of the entities involved in the purported transactions reveals a complete lack of arm's-length dealing.  See Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).  The Spanish investors controlled every entity involved in the transactions.  They controlled the companies that were the source of the payments, the companies that were to receive the payments, and the companies through which the payments passed as part of the commercial paper and other transactions.  See Pittler v. Commissioner, T.C. Memo. 1986-320.  Petitioners argue that the transaction had economic substance because it was difficult to finance petitioners' planned corporate expansion and pay royalties of 12.5 to 15 percent to Manver simultaneously.

Petitioners' argument is unpersuasive for several reasons.  As we concluded earlier, Manver did not own the rights to the intangibles so there was no reason for MSI and MDT to pay royalties to Manver.  The heavy burden imposed by the alleged royalties simply casts further doubt on whether the rates were reasonable.  In fact, because Manver, MSI, and MDT were all controlled by the same individuals, the alleged financial hardship was self-imposed and could easily have been remedied by reducing the royalty rates.  The record is replete with additions, alterations, and revisions to agreements.  Petitioners included in the lump-sum amounts royalty payments of $5.85 million for a second California castle and a New Jersey castle, neither of which was built yet.  The second California castle never opened.  There is neither credible evidence nor reason to believe that an unrelated party would have been willing to pay $5.85 million in advance for royalty payments on speculation as to possible future need for the intangibles.

Petitioners' position is further weakened by the amendments to the MSI/MDT and Manver royalty agreements that provided for payments in excess of the lump-sum amounts if either MDT's or MSI's gross sales exceeded certain base amounts.  The amendments provided that MSI and MDT were to pay Manver 15 percent of their gross sales that were in excess of the base amounts.  An agreement to pay additional royalties, in excess of the lump-sum amounts, is inconsistent with the claim that the original lump-

sum amount created such a hardship to petitioners' expansion plans. It appears more likely that it was just another avenue for the Spanish investors to receive corporate distributions.

Petitioners also argue that there was economic substance to the transactions because Manver gave up the right to substantial pay-as-you-go royalties for several years and instead received cash and promissory notes. Petitioners point out that Manver agreed to accept a lesser sum in exchange for receiving the payments up front. The difference in the amounts was determined by petitioners at the time of the transactions and represented the discount on the total payments, if made over time, to their present value. The purpose of discounting money to its present value is to equalize the current value with the future value. Petitioners imply that there was a disadvantage to the up-front payment because it partially consisted of promissory notes. The Spanish investors, however, owed the notes to the Spanish investors and therefore controlled the risk of loss. Any disadvantage to Manver is illusory.

The circular transfer of money through related parties to create the illusion of payment is an indication of sham transactions. Karme v. Commissioner, 73 T.C. at 1186-1187. In the instant cases, enormous circular money movements between entities controlled by the Spanish investors occurred approximately every 183 days so that the interest on the payments would qualify for the exemption on withholding tax. In Monahan

v. Commissioner, T.C. Memo. 1994-201, affd. without published opinion 86 F.3d 1162 (9th Cir. 1996), we found that the taxpayer's transactions lacked economic substance and stated:

> The various transfers among entities controlled or owned by * * * [the taxpayer] are reminiscent of those with which we have previously dealt. See, e.g., Karme v. Commissioner, 73 T.C. 1163, 1171, 1173-1174 (1980) affd. 673 F.2d 1062 (9th Cir. 1990); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23, affd. 820 F.2d 1543 (9th Cir. 1987); see also Schiavenza v. United States, 52 AFTR2d 83-6364, 85-1 USTC par. 9155 (N.D. Cal. 1984). In those cases, the taxpayers used foreign and domestic entities to make prearranged "money movement[s]" within the "system" of entities. Karme v. Commissioner, supra at 1169. The funds involved in those money movements never left the system of controlled entities. Typical of the transactions in those cases were key documents that "were not executed, and sometimes not even written in final form, until long after their purported dates", id. at 1191, loans and transfers that were made between system entities to negate risk of loss; lenders that were "continu[ing] to enjoy the use" of funds supplied to other entities, id. at 1193; and back-to-back transfers of funds made within hours of each other all resulting in no net outlay of money by any single entity or person. See Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra. As in those cases, "It is apparent that * * * [taxpayer's] transactions * * * 'did not appreciably affect [his] beneficial interest except to reduce [his] tax'." Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra (citing Knetsch v. United States, 364 U.S. 361, 366 (1960), quoting Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957)).

Here, too, the transfers are "reminiscent" of those with which we have previously dealt. Domestic and foreign entities were used to make prearranged money movements within the system of entities controlled by the Spanish investors. In December 1987, the J. Montaner-controlled companies, primarily Dapy, and the Santandreu-controlled companies, primarily Roundabout,

transferred $10 million to Gatetown.  Gatetown transferred the money to MDT and MSI.  MDT and MSI issued commercial paper to five entities that were controlled by the Spanish investors, notwithstanding that the five entities did not contribute any funds to MDT or MSI.  MDT and MSI used the $10 million combined with promissory notes to pay Manver a total of $10 million cash and $12.5 million in promissory notes.

To avoid withholding on the interest on the $12.5 million in notes to Manver, a round of commercial paper was issued.  During March 1988, Manver transferred $9.03 million to Gatetown.  The funds went through a myriad of controlled entities, within a day or two, and ended with MDT's transferring $7.672 million to Manver as payment on the royalties.  Manver then transferred $2.672 million to Gatetown, which then transferred the money through a series of controlled entities, eventually to have $3.354 million transferred back to Gatetown, which transferred it to MSI, which in turn transferred it to Manver.  Petitioners effectively used $7.672 million of funds supplied by Manver to reduce debts to Manver by $11 million.

As subsequent rounds of commercial paper were issued, the interest payments that were made to the controlled entities were then distributed to the Spanish investors' Eurotor companies. The use of the commercial paper not only provided an opportunity to avoid withholding on the interest, it also provided a method

for the Spanish investors to receive corporate distributions tax free.

We examined similar facts in Erhard v. Commissioner, T.C. Memo. 1991-290, modified by T.C. Memo. 1992-376, supplemented by T.C. Memo. 1993-25, affd. 46 F.3d 1470 (9th Cir. 1995), where we concluded:

> Moreover, the record clearly shows that the money movement technique made possible a group of transactions with a total value far in excess of the actual cash involved.  The circular money movements here involved generally began and ended with system entities, with no change in the economic position of the system viewed as a whole.  Quite often, the money movements occurred in a single day.  The stream of money flowing through the intermediate entities, supported by mere bookkeeping entries or by the devices of back to back loans, was without economic substance. See Karme v. Commissioner, supra.

We found that the circular money movement amounted to a sham in substance and underscored a complete lack of economic substance to support an interest expense deduction.  Erhard v. Commissioner, supra.

Petitioners attempt to distinguish the instant cases from the other circular money movement cases.  They argue that, in the instant cases, there is real value underlying the lump-sum royalty payments.  Petitioners contend that the real value consisted of the right to use the payee's valuable intangibles for an extended period.  As we concluded earlier, Manver did not own or transfer the intangibles, and, therefore, petitioners could have used the intangibles without paying Manver.

Petitioners have failed to persuade us that we should treat their circular money movements as anything other than shams.

Additionally, petitioners have failed to persuade us that the transactions were entered into for reasons other than tax avoidance. Petitioners admit on brief that "had they been informed that the Netherlands Antilles treaty exemption for interest would not expire on January 1, 1988 * * * they would have simply signed the notes to Manver, paid interest thereon until the notes were paid off, and completely avoided the commercial paper headaches." Santandreu testified that the reason the commercial paper was issued was "to have the advantages of not paying withholding on the interest." Both of these explanations support the conclusion that the transactions were entered into solely for tax-avoidance purposes.

Petitioners deducted the guarantee fees as an "ordinary and necessary" business expense under section 162. Petitioners rely on A.A. & E.B. Jones Co. v. Commissioner, T.C. Memo. 1960-284, and argue that, because the amount of the guarantee fees did not exceed amounts that would have been charged to an unrelated party, the fees were reasonable for purposes of section 162(a). In that case, surety companies would not issue bonds to cover corporate contracts without the personal guarantees of the Jones brothers. While we looked at the reasonableness of the guarantee fees, there was no issue as to whether the guarantee fees were ordinary and necessary.

Those facts are easily distinguishable from the facts in these cases. Here, petitioners have failed to show that the commercial paper would not have been issued without the guarantee fees. The Spanish investors, through Dapy and Roundabout, provided the money and controlled the entities through which the money flowed. Dapy and Roundabout also guaranteed the issuance of the commercial paper and received the guarantee fees. The guarantee fees were not a condition of the issuance and did not alter the economic substance of the transaction because the fees did not change the level of risk for any of the participants. Dapy and Roundabout had the $10 million that was originally advanced to Gatetown returned to them approximately 6 months after it was advanced. Additionally, the transactions underlying the guarantee payments were shams that were entered into solely for tax-avoidance purposes.

The interest was not paid on genuine indebtedness as required by section 163. There was no ordinary and necessary business purpose for the guarantee fees as required by section 162(a). Therefore, petitioners cannot deduct the interest and guarantee expenses on the lump-sum royalty payments. Accordingly, we sustain respondent's determinations as to those issues.

IV. Interest Deductions on the Section 351 Transactions

Petitioners deducted interest payments on the promissory notes given in exchange for assets in the section 351

transactions.  Petitioners argue that the section 351 transactions established an unconditional obligation to pay and that the promissory notes were valid debt notwithstanding the year-long delay in finalizing the notes.

Respondent contends that the amounts in issue should be treated as equity because petitioners lacked the intent and ability to repay the funds, and, therefore, the funds were at the risk of the business.

The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.  Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957), remanding T.C. Memo. 1956-137 on another issue, affd. 262 F.2d 512 (2d Cir. 1959).

In Gregory v. Helvering, 293 U.S. 465 (1935), the Supreme Court disregarded a corporate reorganization because, although the transaction was in form a reorganization, in substance there was no business purpose other than tax avoidance.  The Court recognized the legal right of a taxpayer to decrease the amount of taxes owed by means that the law permits.  However, the Court qualified the right of the taxpayer to reduce taxes, stating "But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Id. at 469.

The principle set down in <u>Gregory</u> is not limited to situations where the issue is whether or not a transaction is to be completely ignored for tax purposes. The court in <u>Gilbert v. Commissioner</u>, 248 F.2d at 406, stated:

> The principle is fully as applicable where there is no doubt that a very real transaction has taken place and the question is whether the characterization urged by the taxpayer accords with substantial economic reality. In either case the taxpayer must show that his treatment of the transaction does not conflict with the meaning the Congress had in mind when it formulated the section <u>sub judice</u>.

The court in <u>Gilbert</u> acknowledged that statutory terms should not be interpreted independent of their context and underlying policy, concluding that "not every advance cast in the form of a loan gives rise to an 'indebtedness' which will justify a tax deduction." <u>Id.</u> at 440.

In <u>Gilbert v. Commissioner</u>, 248 F.2d at 406-407, the court addressed the issue of what principle is to be applied by the finder of facts in determining whether a given advance of money by a shareholder to a closely held corporation is a loan within the meaning of the Internal Revenue Code. After evaluating various criteria, the court stated:

> Congress evidently meant the significant factor to be whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business * * *
>
> From the point of view of the corporation, the Code allows a deduction for "interest paid * * * on indebtedness," yet it allows no deduction for dividends paid. Thus, where a corporation pays for the use of money which it will return, it is in effect allowed a

deduction for a business expense, just as it is allowed a deduction for the expense of renting a building. Where, however, a corporation pays dividends, it is not incurring a business expense; it is distributing profits. While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of risk involved. Thus, it would do violence to the congressional policy to permit an "interest" deduction where the "loan" is so risky that it can properly be regarded only as venture capital. [Id. at 406-407.]

Applying these principles to the instant cases, we do not have to set aside or disregard the section 351 transactions as a prerequisite to evaluating the interest deductions. We must decide whether the loans as they existed comport with the legislative intent behind section 163 and, specifically, whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or whether the funds were placed at the risk of the business.

According to petitioners' form, after the double section 351 transactions were complete, MSI had $4.4 million worth of assets, of which approximately $3,670,936 was goodwill, and MDT had $14 million in assets, of which approximately $13,696,767 was goodwill. Conversely, MSI's and MDT's tangible assets were valued at approximately $729,064 and $303,233, respectively.

In exchange for the $729,064 in tangible assets and $3,670,936 of goodwill, MSI transferred to MTBV stock that it valued at $1.1 million and a negotiable promissory note valued at $3.3 million. The note bore interest at 9.5 percent, interest only paid quarterly. There were several versions of the note

with different terms including 5 and 6 years.  The note did not state on its face that it was secured.

In exchange for the $303,233 in tangible assets and $13,696,767 of goodwill, MDT transferred to MANB stock that it valued at $3.5 million and a negotiable promissory note valued at $10.5 million.  The note bore interest at 10 percent, interest only paid quarterly, with the principal due in 5 years.  The note did not state on its face that it was secured.

Nassau Lens Co. v. Commissioner, 308 F.2d 39, 47 (2d Cir. 1962), remanding 35 T.C. 268 (1960), articulated the evaluation criteria set forth in Gilbert v. Commissioner, stating:  "The starting point is, of course, whether there is an intent to repay, for in the absence of that no debt can be said to exist." In reaching a conclusion as to petitioners' intent to repay, we gave substantial weight to petitioners' delay in finalizing the promissory notes until December 1988, over a year after the section 351 transactions occurred.

Petitioners rely on several cases to argue that the courts have held that absence of a formal writing does not affect the validity of the underlying debt.  See, e.g., Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 622 (1964); Baldwin v. Commissioner, T.C. Memo. 1993-433.  However, these cases are primarily concerned with entities changing from partnerships to corporations and do not involve such lengthy time

periods or promissory notes based on intangible assets that are not owned by the taxpayer.

Respondent contends, and we agree, that the reason the notes were not finalized was because C&L was waiting for tax rulings that would determine how the interest payments would be taxed. There were no discussions on the repayment of the debt or on obtaining security for the promissory notes. Petitioners argue that the reason that there were no discussions as to repayment is "obvious". Petitioners' obvious reason is that there was never any question that the debt was intended to be repaid. It appears equally obvious that petitioners were not concerned with repayment. The delay in finalizing the promissory notes supports respondent's view.

The delay in finalizing the promissory notes also indicates a lack of arm's-length dealing. Advances to a closely held corporation by its shareholders are subject to particular scrutiny: "The absence of arm's-length dealing provides the opportunity to contrive a fictional debt shielding the real essence of the transaction and obtaining benefits unintended by the statute." Gilboy v. Commissioner, T.C. Memo. 1978-114. An unrelated third party would not transfer substantial assets over a year in advance of receiving the promissory notes. An unrelated third party would be concerned about repayment of the notes when the asset supporting the notes consisted primarily of

goodwill in the form of tradenames and trademarks that, according to petitioners' form, the obligee did not own.

We do not believe outside investors would have made similar advances. The notes were unsecured, and the "leased" intangibles were 98 percent and 83 percent of the total value of MDT and MSI, respectively. In the event petitioners were unable to repay, a creditor would have little, if any, chance of recovering the loan. Additionally, an outside investor would want to have the "value" of the entities substantiated. The "value" of MANV increased from $6,174,800 on January 31, 1987, to $14 million on September 30, 1987.

Although tax savings motives are not given conclusive weight, they should be given weight commensurate with the extent to which "they contribute to an understanding of the external facts of the situation." Gilbert v. Commissioner, 248 F.2d at 407. The facts overwhelmingly support that the motive for the section 351 transactions was tax avoidance. The finalization of every document was predicated on tax rulings from various foreign entities. The corporate planning was centered around methods to repatriate funds without paying tax. As we discussed previously, the form to avoid taxes was created by petitioners and C&L, and the documents were created to fit that form, notwithstanding the substance of the arrangements.

The preponderance of the evidence supports the conclusion that the funds were placed at the risk of the business and

repayment was dependent on the success of the venture. We reach that conclusion because petitioners lacked the intent to repay, the transactions were not at arm's length, an unrelated creditor would not have made similar advances, and the transactions were driven solely by tax-avoidance motives. Gilbert v. Commissioner, supra; Gilboy v. Commissioner, supra. Accordingly, the treatment of the loans as valid indebtedness would not comport with the intent of section 163. Therefore, respondent's determinations will be sustained as to this issue.

V. The $236,313 That MDT Paid to MSI as a Marketing Fee

Petitioners deducted $236,313 as a marketing expense on their fiscal year 1987 (December 1, 1986, to November 30, 1987) Federal tax return. Petitioners argue that MDT paid MSI the money as compensation for the use of MSI personnel in connection with opening the California castle.

Respondent contends that the payments were an attempt to split profits between MSI and MDT and, as such, were not deductible. Respondent also contends that the documents memorializing the transaction were backdated.

Petitioners sought advice from C&L on how to structure an arrangement where two entities could share profits and losses equally while one company retained the benefit of appreciation in the property. In October 1986, C&L gave petitioner advice that consisted of warnings about tax implications and a suggestion to set up a management agreement with fees contingent on profits.

During June or July 1989, a document dated March 1986 appeared. The document contained the advice that C&L rendered 7 months after the date on the document. We are unpersuaded that the similarities were coincidental. Additionally, the payment term of not later than 1 year after MANV filed its 1986 tax returns would have required a payment no later than June 7, 1989. MDT/MANV paid MSI/MTNV with a check dated July 3, 1989. We are persuaded that the documents were backdated. Although backdated documents may imply fraudulent intent, it does not necessarily mandate a denial of petitioners' deduction. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Baldwin v. Commissioner, T.C. Memo. 1993-433. Petitioners, however, have the burden of proving that the payments were for marketing fees. Because of the lack of credible evidence to support petitioners' position and the unreliability of the backdated documents, we conclude that petitioners have not met their burden of proof. Accordingly, we sustain respondent's determination with respect to this issue.

VI. New Jersey and California Expansion Expenses

Petitioners deducted expenses incurred with the development of two new castles in California and New Jersey. Petitioners argue that these amounts were expended for their own benefit and account in the expansion of their existing business to new locations.

Respondent disallowed the deductions on the basis that the expenses did not belong to MDT but were startup expenses of separate entities, GCI/SDCI and MCI.  Petitioners agree that the subsidiaries were separate legal entities but argue that the issue is whether the expansion was carried out by GCI/SDCI and MCI or by petitioners.

"While a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not."  Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).  The issue is whether petitioners may retroactively change their form once petitioners realized that there was a tax advantage to a different type of organizational structure.

A taxpayer generally may not successfully contend that the substance of a transaction was other than the form he chose:

> As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction.  The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true "substance" would encourage post-transactional tax-planning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government.  * * *  [Citations omitted.]

In re Steen, 509 F.2d 1398, 1402-1403 n.4 (9th Cir. 1975); J.A. Tobin Constr. Co. v. Commissioner, 85 T.C. 1005, 1021 (1985). C&L's August 1988 tax planning letter to Santandreu set out the

then current structure of GCI/SDCI and MCI, i.e., separate corporations for each castle--the format adopted for the Florida and Buena Park castles. The letter stated that they were separate entities that had, and were currently incurring, startup costs. The C&L letter recommended that MDT <u>recharacterize</u> previous advances made to the separate entities as "divisional expenditures" and operate the two entities as divisions, noting that "Andres Gelabert indicated that the minority shareholders would have no objection to this idea." The reason for making these recommendations was solely to achieve tax benefits. The anticipated benefits were that MDT could deduct MCI's and GCI/SDCI's startup expenses and lump-sum franchise payments.

Both MCI and GCI/SDCI continued to operate in their own names after C&L suggested the divisional changes. GCI/SDCI had board of directors meetings into October 1989. MCI continued to do business and enter into contracts in its own name until the New Jersey castle opened. Based on petitioners' documentation and their conduct, we are persuaded that MCI and GCI/SDCI were separate entities that incurred their own startup costs. Accordingly, respondent's determination as to this issue will be sustained.

## VII. <u>Additions to Tax and Penalties for Fraud and Negligence</u>

### A. <u>Fraud</u>

Respondent determined that some of petitioners are subject to additions to tax and penalties for fraud and, in the

alternative, negligence. The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938).

Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Specifically, respondent must prove (1) an underpayment of tax and (2) fraudulent intent. Respondent cannot rely on petitioners' failure to overcome the normal presumption of correctness of the notice of deficiency as to any of the elements necessary to proving fraud. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969); Klein v. Commissioner, T.C. Memo. 1984-392, affd. 880 F.2d 260 (10th Cir. 1989). Thus our disallowance of various disputed deductions does not satisfy respondent's burden of proving, by clear and convincing evidence, an underpayment to which the addition to tax for fraud applies.

Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealing assets, or failure to cooperate with tax authorities. Spies v. Commissioner, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Respondent cites numerous badges of fraud, such as the creation and backdating of documents, false statements in documents, the use of nominees, and the failure to disclose related-party information to the IRS. The facts indicate, and we have concluded in previous portions of this opinion, that petitioners backdated and created documents, put false information in documents, used nominees to sign documents, and presented the false documents to the IRS. However, the presence of badges of fraud will not automatically negate an alternative explanation for petitioners' actions. Ishijima v. Commissioner, T.C. Memo. 1994-353; Klein v. Commissioner, supra.

Petitioners argue that they are not liable for additions to tax and penalties for fraud or negligence because they reasonably and in good faith followed the advice of C&L and other professionals. In their brief, petitioners state "they had no reason to believe that the advice they received was incorrect, nor did they have the knowledge or experience to second-guess that advice" (citing United States v. Boyle, 469 U.S. 241, 251 (1985)).

Respondent argues that petitioners were sophisticated businessmen who were able to function in a highly competitive environment, and, therefore, they cannot claim reliance on their advisers, particularly if petitioners failed to provide the advisers with correct and complete information. See Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Additionally, respondent

points out that petitioners did not always follow the advice of their advisers.

In all their business planning, petitioners had as a goal reducing their taxes. Tax reduction is an acceptable goal as long as the reduction involves transactions with substance and is by a legal means. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). C&L offered tax planning that would reduce petitioners' taxes. Throughout C&L's engagement with petitioners, C&L suggested various organizational changes and structures that would reduce petitioners' taxes. The badges of fraud occurred after C&L suggested a new organizational structure or change for petitioners. C&L suggested that petitioners' organization was a franchise, and backdated documents appeared, specifically the January 20 and February 1, 1983, agreements. Those 1983 agreements attempted to substantiate a franchise arrangement and contained the same language that was in a tax planning letter that C&L sent to petitioners in 1986. C&L obtained tax rulings on which company should own the intangibles, and, subsequently, backdated documents appeared that attempted to substantiate the chain of sale of the intangibles from TM to Gatetown to Manver. C&L suggested licensing agreements for the intangibles, and, subsequently, backdated documents appeared, containing the same language that was in a draft letter written 6 months after the date on the licensing agreements. C&L

suggested commercial paper as a method to avoid withholding tax, and petitioners engaged in circular financing transactions.

On numerous occasions, C&L received information from petitioners that was contradictory to information that C&L already knew or that did not fit with the tax plan. When the information was subsequently changed to fit the tax plan, C&L never questioned it. In December 1986, C&L received documents that included a contract for the sale of intangibles from TM directly to Manver. Later, that contract was replaced by two contracts that represented a sale of the intangibles from TM to Gatetown and then from Gatetown to Manver. In C&L's files, there are notes that indicate the actual ownership of many of the corporations involved in the various transactions. C&L prepared petitioners' returns without disclosing the related-party information. C&L's California office misled or failed to advise its Florida office of certain material facts. C&L knew that GCI/SDCI and MCI were operating as separate entities. When C&L determined that taxes could be avoided, it advised petitioners to recharacterize the entities to divisions.

C&L apparently put its own pecuniary interest and its desire to continue working for petitioners over its duty to reasonably ascertain the true facts and fully to inform petitioners of the consequences of following C&L's advice. Petitioners provided information to C&L, albeit not all correct information, and C&L chose to be selective with the information. C&L chose to use the

information that assisted C&L with petitioners' tax planning strategy and to claim ignorance of any other information.  Cf. United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976) (defining "willful blindness"); United States v. Aleman, 728 F.2d 492, 494 (11th Cir. 1984).

C&L suggested tax-avoidance strategies, and petitioners tried to comply with C&L's recommendations, even when petitioners believed that compliance involved fabricating documents.  C&L failed to advise petitioners fully as to their obligations and failed to make any effort to obtain the correct facts.  These failures, coupled with C&L's use of the "form" created by the false documents, amounted to tacit advice by C&L that petitioners' actions were not only acceptable but desired.  C&L's tacit approval caused petitioners to continue in the practice-- C&L suggested the plan, petitioners responded, and C&L continued with the next tax planning strategy.  The Spanish investors were sophisticated businessmen, but they relied on C&L to advise them with respect to the requirements of U.S. law.

We agree that there are many badges of fraud present in these cases.  We conclude, however, that respondent has not negated the alternative explanation, petitioners' reliance on C&L, by clear and convincing evidence.  Moreover, respondent has not proven the falsity of the disallowed deductions by clear and convincing evidence.  The additions to tax and penalties for fraud will not be sustained.

B. <u>Negligence</u>

Section 6653(a)(1) imposes an addition to tax in an amount equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or disregard of rules or regulations. Section 6653(a)(1) applies to tax returns with a due date prior to December 31, 1989. The section was repealed December 31, 1989, and recodified in section 6662. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of underpayment which is attributable to negligence or disregard of rules or regulations.

"Negligence" is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985) (quoting <u>Marcello v. Commissioner</u>, 308 F.2d 499, 506 (5th Cir. 1967)). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return, including any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

Petitioners argue that they should not be liable for the negligence penalty because they relied on their advisers.

Petitioners state that the reliance was reasonable given petitioners' language problems, lack of U.S. business experience, and total unfamiliarity with U.S. tax laws.

Respondent contends that petitioners disregarded rules or regulations and were negligent when they created false and backdated documents, submitted false information on their tax returns and to the IRS during audit, and claimed deductions based on the false information. Respondent states that petitioners cannot claim reliance on their advisers because petitioners provided incomplete and incorrect information to C&L and disregarded C&L's advice.

Petitioners rely on United States v. Boyle, 469 U.S. 241 (1985). In Boyle, the Supreme Court stated that it is reasonable for a taxpayer to rely on an accountant or attorney who advises a taxpayer on a matter of tax law. Id. at 251. However, "Reliance by a lay person on a lawyer is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute." Id. In Boyle, the taxpayer failed to file an estate tax return. The Supreme Court stated that it takes no special training or effort to ascertain a deadline and make sure that it is met. The Court held that the taxpayer's failure to file was not excused by the taxpayer's reliance on an agent.

In these cases, petitioners failed to comply with unambiguous information requests on their Federal tax returns and during the IRS audit. As early as 1985, petitioners were

notified by C&L's Orlando office that a reporting entity had to report each transaction with a related party on a Form 5472, which should be filed with their tax returns.  The Federal tax forms specifically requested information about related parties.  Petitioners failed to disclose all of the required information and to file the appropriate Forms 5472.  Taxpayers cannot hide behind a claim that they were not aware of the need to provide the information because they did not read their returns.  The voluntary failure to read a return and blind reliance on another for the accuracy of a return are not sufficient bases to avoid liability for negligence additions to tax.  Bailey v. Commissioner, 21 T.C. 678, 687 (1954).  Additionally, petitioners continued to withhold related-party information.  During the IRS audit, Santandreu provided a document to the IRS that stated that he did not know the shareholders of Dapy, Manver, Lince, and Promidux.

Petitioners were owned and operated by sophisticated businessmen.  They did not have to have knowledge of U.S. tax laws or any special training to understand the significance of creating and backdating documents.  A central figure with respect to the backdated documents, Onate, was not called by petitioners to testify, notwithstanding the Court's expressed interest in having him called as a witness.  Respondent was unable to effectuate service on Onate because Onate was out of the country.  Petitioners also did not call A. Gelabert or Segui to testify.

At the time of trial, Kim testified as an officer of petitioners. His testimony concerning what he, Forsyth, and others knew in 1986 and what he knew when he signed returns as a corporate officer was evasive, ambiguous, and inconsistent.

In these cases, the volume of backdated documents in evidence was substantial and included:  1983 contracts, 1986 licensing agreements, contracts for the sale of the TM intangibles, and the promissory notes in the section 351 transactions.  In addition to the versions of the documents that petitioners claim are authentic, there are numerous versions of many of the documents that contained varying price terms, party names, interest rates, and maturity dates.

Respondent failed to prove by clear and convincing evidence that petitioners' claimed reliance on C&L was fictitious. However, for reliance to be a defense to negligence, petitioners must prove that the reliance was reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners cannot claim reliance on their advisers' advice if they failed to follow it.  C&L advised that it was better not to have related parties in the commercial paper transactions and as guarantors.  Forsyth testified that he had specifically discussed the use of related parties with Onate and that Forsyth's preference "was that the majority of the investors be

or the substantial part of the investment be purchased by unrelated parties."  Petitioners used related parties anyway.

In one of Forsyth's draft letters, which recounted meetings with Santandreu, C&L advised against claiming a "super royalty" franchise payment and management fees.[2]  Petitioners claimed a super royalty, i.e., 15 percent, in addition to 2 percent management fees.  Forsyth testified that documents marked "draft" were used for discussion purposes.  Notes of a subsequent meeting, contained in C&L's files and introduced into evidence by petitioners, specifically refer to discussions of the royalty rates and management fees by reference to the draft document.  Thus, we believe that petitioners were aware of and disregarded C&L's advice.

Petitioners also rely on Heasley v. Commissioner, 902 F.2d 380, 383-384 (5th Cir. 1990), revg. T.C. Memo. 1988-408, and argue that petitioners did not have the knowledge or experience to question their advisers.  See Vorshek v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991).  We find material distinctions between the Heasleys and the officers of petitioners.  Here, petitioners' officers had considerable business experience and were given specific requests and advice.  Petitioners' officers were able to understand what was expected of them.

---

[2] Petitioners contend that respondent's argument on this last point is based on an exhibit that was not received in evidence.  We rely, however, on Exhibit BGS, which was received on May 1, 1996, and is quoted in our findings.

We are not persuaded that petitioners' claimed reliance on their advisers was reasonable. The record contains numerous instances where petitioners' officers were aware of the rules and regulations and either disregarded them or did not make a reasonable attempt to comply with them. Therefore, we sustain respondent's determination as to the negligence penalties.

VIII. Substantial Understatement and Increased Interest

A. Substantial Understatement

Section 6661 imposes an addition to tax in an amount equal to 25 percent of the underpayment of income tax if the underpayment is attributable to a substantial understatement. Section 6661 applies to tax returns with a due date prior to December 31, 1989. The section was repealed December 31, 1989, and recodified in section 6662.

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of underpayment which is attributable to any substantial understatement of income tax.

For purposes of sections 6661 and 6662(a), an understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $5,000 or, in the case of a corporate taxpayer, $10,000. Secs. 6661(b)(1)(A) and (B), 6662(d)(1)(A) and (B). The term "understatement" is defined as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax shown on the return for the taxable year reduced by any rebate. Secs. 6661(b)(2), 6662(d)(2)(A). In

calculating understatements, items for which there was substantial authority or adequate disclosure are not to be considered. Secs. 6661(b)(2)(B)(i) and (ii), 6662(d)(2)(B)(i) and (ii).

Petitioners argue that there was no understatement, and, if the Court determines that there was a substantial understatement, the addition to tax should be waived because there was reasonable cause for the understatement and petitioners acted in good faith.

We are not persuaded that petitioners acted in good faith or that they had reasonable cause for the understatements. Petitioners' failure to submit Forms 5472 was an attempt at concealment, not disclosure. Accordingly, respondent's determination will be sustained.

B. <u>Increased Interest</u>

Former section 6621(c) applies to tax returns with a due date prior to December 31, 1989, and provides for an increase in the rate of interest on underpayments. The rate is increased to 120 percent of the statutory rate on underpayments that exceed $1,000 and are <u>attributable to</u> tax-motivated transactions. Tax-motivated transactions include "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v).

Petitioners argue that they are not liable for the increased rate because they did not engage in any sham or fraudulent transactions. We have previously concluded that petitioners engaged in several tax-motivated transactions that lacked

economic substance. Such transactions are sham within the meaning of section 6621(c). Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); DeMartino v. Commissioner, 88 T.C. 583 (1987), affd. 862 F.2d 400 (2d Cir. 1988), affd. without published opinion sub nom. McDaniel v. Commissioner, 862 F.2d 308 (3d Cir. 1988). The underpayments attributable to those transactions will bear additional interest, as will any others where petitioners have not specifically proven that respondent's determination was erroneous.

IX. Withholding of Tax at the Source

Sections 1441 and 1442 provide for a 30-percent withholding tax on foreign individuals and corporations as follows:

SEC. 1441. WITHHOLDING OF TAX ON NONRESIDENT ALIENS.

(a) General Rule.-- * * * all persons, in whatever capacity acting (including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States) having the control, receipt, custody, disposal, or payment of any of the items of income specified in subsection (b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual or of any foreign partnership shall (except as otherwise provided in regulations prescribed by the Secretary under section 874) deduct and withhold from such items a tax equal to 30 percent thereof * * *

(b) Income items.--The items of income referred to in subsection (a) are interest (other than original issue discount as defined in section 1273), dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income * * *

SEC. 1442.  WITHHOLDING OF TAX ON FOREIGN CORPORATIONS.

(a) General Rule.--In the case of foreign corporations subject to taxation under this subtitle, there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 a tax equal to 30 percent thereof.  * * *

Respondent determined that petitioners were liable for withholding tax on the deficiencies related to:

(a) Interest that MDT and MSI paid to MABV and MTBV, respectively;

(b) franchise fees that MANV paid to Manver in the fiscal year ended November 30, 1987;

(c) amounts that MDT and MSI paid to Manver in March 1988;

(d) amounts that MANV, MSI, and MDT paid to Eurotor as management and consulting fees;

(e) guarantee fees that MDT and MSI paid to Dapy and Roundabout in connection with the commercial paper transactions;

(f) interest that MDT and MSI paid to the commercial paper holders; and

(g) fees that MANV paid to Santandreu and Segui in the fiscal year ended November 30, 1987.

The aggregate amounts for MSI and MDT are approximately as follows:

|          | Year | Total Adjustments |
|----------|------|-------------------|
| MSI      | 1988 | $4,595,445.79     |
|          | 1989 | 1,044,273.46      |
| MANV/MDT | 1987 | 1,644,863.00      |
|          | 1988 | 9,142,864.57      |
|          | 1989 | 1,429,130.80      |

A substantial portion of the amounts that constituted the total adjustments listed as items (a) through (g) above was ultimately paid to the Spanish investors through the various entities representing them.  In contrast, total dividend payments were approximately as follows:

|      | Year(s)   | Total Dividends Paid |
|------|-----------|----------------------|
| MTNV | 1983-1987 | $1,350,006.52        |
| MSI  | 1987-1991 | -0-                  |
| MANV | 1986-1987 | 2,500,000.00         |
| MDT  | 1987-1991 | -0-                  |

Petitioners have conceded items (f) and (g); therefore, only issues (a) through (e) remain for decision.

A. Interest that MDT and MSI Paid to MABV and MTBV, Respectively

Petitioners argue that the interest paid on the promissory notes that were exchanged in the section 351 transactions was not subject to withholding because interest was exempt under a Dutch Treaty in existence at the time.  Petitioners argue that MABV and MTBV were viable business entities and that the debt owed to them was bona fide.

Respondent contends that, to the extent the Court finds that the payments are return of equity and not interest, petitioners

are liable for withholding because they have not established any treaty exemption.

We concluded earlier that the amounts that were paid from MDT and MSI to MABV and MTBV were not interest because there was no debt as required under section 163. In reaching our conclusion, we did not have to make a decision about the viability of MABV and MTBV as business entities, and we do not have to do so now. The payments that MDT and MSI made to MABV and MTBV, respectively, were paid in relation to an equity contribution from MABV and MTBV to MDT and MSI, respectively. Accordingly, the payments are subject to the withholding tax, and respondent's determination is sustained.

B. <u>Franchise Fees That Were Paid by MANV to Manver in Fiscal Year Ended November 30, 1987</u>

Petitioners argue that Manver was a corporation validly formed under the laws of The Netherlands and that the payments were exempt under a treaty with The Netherlands.

Respondent contends that the payments were disguised dividends that were paid to the Spanish investors, and, therefore, petitioners are not entitled to a benefit under the treaty.

We concluded earlier that Manver did not own the intangibles, and, therefore, there was no "arm's-length" reason to make franchise payments, and the payments were not "ordinary and necessary" under section 162(a). Because MANV had no reason to compensate Manver, the MANV payments were dividends to the

shareholders of MANV.  Although the dividends in form passed through Manver, the ultimate payees were the MANV shareholders. Accordingly, the payments are subject to withholding tax, and respondent's determination is sustained.

C.  <u>MDT and MSI Payments to Manver in March 1988</u>

Petitioners argue that the March 1988 transactions in connection with the up-front royalty payments were not shams, and the cash payments should be recognized.  Petitioners further argue that there is no withholding applicable because the significant event for withholding tax purposes was the lump-sum payment in December 1987.

Respondent contends that the up-front payments were illusory and shams, and, therefore, those payments were not subject to withholding.  Respondent asserts that the withholding would apply later when petitioners repatriated the funds as dividends through the guise of loan payments.

We concluded previously that the transactions in connection with the up-front royalty payments were shams that were entered into solely for tax-avoidance purposes.  We agree with respondent that the payments were illusory and are not subject to withholding.  We also agree that the amounts paid out as loan payments on the transactions were dividends and were subject to withholding when the payments were made.  Accordingly, respondent's determination is sustained.

D.  Amounts That MANV, MSI, and MDT Paid to Eurotor as Management and Consulting Fees

Petitioners argue that the management and consulting fees that were paid to Eurotor represent income effectively connected with the conduct of Eurotor's trade or business; that the income was reported on income tax returns filed by Eurotor in the United States; and, therefore, that no income tax withholding was required under section 1442(a).

Respondent contends that the amounts paid were for services or dividends and, because they are U.S. source income, are subject to the withholding.

Section 1441(c)(1) provides an exception to the withholding rules under sections 1441 and 1442:

> (1) Income connected with United States business.--No deduction or withholding under subsection (a) shall be required in the case of any item of income (other than compensation for personal services) which is effectively connected with the conduct of a trade or business within the United States and which is included in the gross income of the recipient * * * for the taxable year.

Section 1442(a) incorporates the section 1441(c) exclusion as it applies to corporations.  We have previously concluded that the management and consulting fees paid to Eurotor were reasonable and for management services as required by section 162, and, accordingly, we have allowed the deductions.  As petitioners point out, the income must be effectively connected with a trade or business and included in the gross income of the recipient.  Eurotor's Federal tax returns for fiscal years ended

July 31, 1986, and July 31, 1987, reported income effectively connected with a trade or business in the United States. Eurotor's Federal tax return for the fiscal year ended July 31, 1988, was marked "Final Return" and contained the following statement:

> Eurator S.A. (98-0063013) is not effectively connected with the conduct of a trade or business accordingly, Eurator S.A. is not required to file a U.S. income tax return of a foreign corporation (Form 1120F).

The return did not report any effectively connected income for 1988, and there is no evidence that a 1989 return was filed. Therefore, to the extent that Eurotor reported the management and consulting fees on its 1987 Federal tax return, petitioners are entitled to the exemption from withholding. For 1988 and 1989, petitioners are not entitled to the exemption from withholding because the management services were U.S. source income and there was no effectively connected income included in the gross income of the recipient.

E. Guarantee Fees Paid to Dapy and Roundabout in Connection With the Commercial Paper Transactions

Petitioners argue that the guarantee fees were not specifically sourced under section 861 or 862 and urge the Court to characterize the payments as for services or to adopt an insurance premium analogy.

Respondent contends that, to the extent the Court concludes that the payments are dividends, the payments are subject to withholding. We concluded earlier that the payments underlying

the guarantee fees were shams and that there was no "ordinary and necessary" business purpose for the guarantee fees as required by section 162. The amounts paid to Dapy and Roundabout, and subsequently distributed to the Spanish investors as guarantee fees, were dividends. Accordingly, respondent's determination will be sustained.

X.  Failure To Deposit Withholding Tax

Respondent contends that petitioners are liable for a penalty under section 6656 because they "failed to withhold and periodically deposit withholdings of tax". Respondent asserts that the penalty applies to the extent that the Court concludes that the MDT payments to various foreign entities and individuals were subject to the 30-percent withholding under section 1442 and petitioners failed to withhold.

Section 6656, as it applies to returns with a due date prior to December 31, 1989, states:

> SEC. 6656.   FAILURE TO MAKE DEPOSIT OF TAXES OR
>              OVERSTATEMENT OF DEPOSITS.
>
> (a) Underpayment of Deposits.--In case of failure by any person required by this title or by regulation of the Secretary under this title to deposit on the date prescribed therefor any amount of tax imposed by this title in such government depositary as is authorized under section 6302(c) to receive such deposit, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be imposed upon such person a penalty of 10 percent of the amount of the underpayment. For purposes of this subsection, the term "underpayment" means the excess of the amount of the tax required to be so deposited over the amount, if any, thereof deposited on or before the date prescribed therefor.

Petitioners rely on Rev. Rul. 75-191, 1975-1 C.B. 376, to support their position that the penalty is not applicable. Petitioners' reliance is misplaced because Rev. Rul. 75-191 addresses employee and employee Federal Insurance Contributions Act (FICA) and income taxes, which are not in issue here. Petitioners argue further that "the facts and law were sufficiently doubtful that there was reasonable cause for MDT's failure to withhold, and MDT relied on the advice of C&L."

As we concluded earlier, the facts and law were not sufficiently doubtful as to petitioners' obligation to withhold. Petitioners misrepresented the facts and disregarded the rules, the regulations and the advice of C&L's Florida office. The preponderance of the evidence supports the conclusion that petitioners' failure to withhold and deposit was not due to reasonable cause. See Ellwest Stereo Theaters v. Commissioner, T.C. Memo. 1995-610. Accordingly, respondent's determination as to this issue is sustained.

To reflect the foregoing and concessions of the parties,

Decisions will be entered

under Rule 155.